# FLAGG BROS., INC., ET AL. *v.* BROOKS ET AL.

No. 77–25.   Argued January 18, 1978—Decided May 15, 1978*

---

*Together with No. 77–37, *Lefkowitz, Attorney General of New York* v. *Brooks et al.;* and No. 77–42, *American Warehousemen's Assn. et al.* v. *Brooks et al.,* also on certiorari to the same court.

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, Blackmun, and Powell, JJ., joined. Marshall, J., filed a dissenting opinion, *post,* p. 166. Stevens, J., filed a dissenting opinion, in which White and Marshall, JJ., joined, *post,* p. 168. Brennan, J., took no part in the consideration or decision of the cases.

*Alvin Altman* argued the cause and filed briefs for petitioners in No. 77–25. *A. Seth Greenwald,* Assistant Attorney General of New York, argued the cause for petitioner in No. 77–37. With him on the briefs were *Louis J. Lefkowitz,* Attorney General, *pro se,* and *Samuel A. Hirshowitz,* First Assistant Attorney General. *William H. Towle* filed a brief for petitioners in No. 77–42. *Arnold H. Shaw* filed a brief for the Warehousemen's Association of New York and New Jersey, Inc., et al., respondents under this Court's Rule 21 (4), in support of petitioners.

*Martin A. Schwartz* argued the cause for respondents Brooks

et al. in all cases.   With him on the brief was *Lawrence S. Kahn*.†

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

The question presented by this litigation is whether a warehouseman's proposed sale of goods entrusted to him for storage, as permitted by New York Uniform Commercial Code § 7–210 (McKinney 1964),[1] is an action properly attributable

---

†Briefs of *amici curiae* urging affirmance were filed by *W. Bernard Richland* and *L. Kevin Sheridan* for the city of New York; by *John E. Kirklin* and *Kalman Finkel* for the Legal Aid Society of New York City; by *John C. Esposito* for the New York State Consumer Protection Board; and by *Robert S. Catz* for the Urban Law Institute in No. 77–42.

[1] The challenged statute reads in full:

"§ 7—210.   Enforcement of Warehouseman's Lien

"(1) Except as provided in subsection (2), a warehouseman's lien may be enforced by public or private sale of the goods in bloc or in parcels, at any time or place and on any terms which are commercially reasonable, after notifying all persons known to claim an interest in the goods.  Such notification must include a statement of the amount due, the nature of the proposed sale and the time and place of any public sale.  The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the warehouseman is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner.  If the warehouseman either sells the goods in the usual manner in any recognized market therefor, or if he sells at the price current in such market at the time of his sale, or if he has otherwise sold in conformity with commercially reasonable practices among dealers in the type of goods sold, he has sold in a commercially reasonable manner.  A sale of more goods than apparently necessary to be offered to insure satisfaction of the obligation is not commercially reasonable except in cases covered by the preceding sentence.

"(2) A warehouseman's lien on goods other than goods stored by a merchant in the course of his business may be enforced only as follows:

"(a) All persons known to claim an interest in the goods must be notified.

"(b) The notification must be delivered in person or sent by registered or certified letter to the last known address of any person to be notified.

"(c) The notification must include an itemized statement of the claim, a

to the State of New York. The District Court found that the warehouseman's conduct was not that of the State, and dismissed this suit for want of jurisdiction under 28 U. S. C.

---

description of the goods subject to the lien, a demand for payment within a specified time not less than ten days after receipt of the notification, and a conspicuous statement that unless the claim is paid within that time the goods will be advertised for sale and sold by auction at a specified time and place.

"(d) The sale must conform to the terms of the notification.

"(e) The sale must be held at the nearest suitable place to that where the goods are held or stored.

"(f) After the expiration of the time given in the notification, an advertisement of the sale must be published once a week for two weeks consecutively in a newspaper of general circulation where the sale is to be held. The advertisement must include a description of the goods, the name of the person on whose account they are being held, and the time and place of the sale. The sale must take place at least fifteen days after the first publication. If there is no newspaper of general circulation where the sale is to be held, the advertisement must be posted at least ten days before the sale in not less than six conspicuous places in the neighborhood of the proposed sale.

"(3) Before any sale pursuant to this section any person claiming a right in the goods may pay the amount necessary to satisfy the lien and the reasonable expenses incurred under this section. In that event the goods must not be sold, but must be retained by the warehouseman subject to the terms of the receipt and this Article.

"(4) The warehouseman may buy at any public sale pursuant to this section.

"(5) A purchaser in good faith of goods sold to enforce a warehouseman's lien takes the goods free of any rights of persons against whom the lien was valid, despite noncompliance by the warehouseman with the requirements of this section.

"(6) The warehouseman may satisfy his lien from the proceeds of any sale pursuant to this section but must hold the balance, if any, for delivery on demand to any person to whom he would have been bound to deliver the goods.

"(7) The rights provided by this section shall be in addition to all other rights allowed by law to a creditor against his debtor.

"(8) Where a lien is on goods stored by a merchant in the course of his

§ 1343 (3). 404 F. Supp. 1059 (SDNY 1975). The Court of Appeals for the Second Circuit, in reversing the judgment of the District Court, found sufficient state involvement with the proposed sale to invoke the provisions of the Due Process Clause of the Fourteenth Amendment. 553 F. 2d 764 (1977). We agree with the District Court, and we therefore reverse.

## I

According to her complaint, the allegations of which we must accept as true, respondent Shirley Brooks and her family were evicted from their apartment in Mount Vernon, N. Y., on June 13, 1973. The city marshal arranged for Brooks' possessions to be stored by petitioner Flagg Brothers, Inc., in its warehouse. Brooks was informed of the cost of moving and storage, and she instructed the workmen to proceed, although she found the price too high. On August 25, 1973, after a series of disputes over the validity of the charges being claimed by petitioner Flagg Brothers, Brooks received a letter demanding that her account be brought up to date within 10 days "or your furniture will be sold." App. 13a. A series of subsequent letters from respondent and her attorneys produced no satisfaction.

Brooks thereupon initiated this class action in the District Court under 42 U. S. C. § 1983, seeking damages, an injunction against the threatened sale of her belongings, and the declaration that such a sale pursuant to § 7–210 would violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment. She was later joined in her action by Gloria Jones, another resident of Mount Vernon whose goods had been stored by Flagg Brothers following her eviction.

---

business the lien may be enforced in accordance with either subsection (1) or (2).

"(9) The warehouseman is liable for damages caused by failure to comply with the requirements for sale under this section and in case of willful violation is liable for conversion."

The American Warehousemen's Association and the International Association of Refrigerated Warehouses, Inc., moved to intervene as defendants, as did the Attorney General of New York and others seeking to defend the constitutionality of the challenged statute.[2]   On July 7, 1975, the District Court, relying primarily on our decision in *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345 (1974), dismissed the complaint for failure to state a claim for relief under § 1983.

A divided panel of the Court of Appeals reversed.[3]   The majority noted that *Jackson* had suggested that state action might be found in the exercise by a private party of " 'some

---

[2] In his order granting the motions to intervene, Judge Gurfein noted that respondent Brooks' goods had been returned to her, but he found that her action had been saved from mootness by her claim for damages.   63 F. R. D. 409, 412 (SDNY 1974).   We have no occasion to consider the correctness of that decision, since we have concluded, n. 3, *infra,* that the claim of respondent Jones remains alive.

[3] Jones died prior to the court's decision.   However, the court concluded that, under 42 U. S. C. § 1983, her claim survived for the benefit of her estate, since a comparable claim would survive under applicable New York law.   553 F. 2d, at 768 n. 7.   For simplicity, Jones will be referred to as a respondent herein.

The court also noted that Jones had recovered most of her possessions after the District Court's dismissal of her action.   Unlike Brooks, she paid the charges demanded by Flagg Brothers, but did so "only because of alleged threats of sale and the twenty-month detention of the goods." *Ibid.*

At this point in the litigation, it is clear that Flagg Brothers has not sold and will not sell the belongings of either respondent.   Although injunctive relief against such sale is therefore no longer available, we must reach the merits of the claim if either respondent can demonstrate that she has suffered monetary damage by reason of the workings of § 7-210.   See, *e. g., Liner* v. *Jafco, Inc.*, 375 U. S. 301, 305-306 (1964).   The affidavit submitted with Jones' complaint alleges that Flagg Brothers charged her an auctioneer's fee, pursuant to § 7-210 (3), which she has now paid.   If she is correct that the warehouseman's invocation of the statute constitutes a violation by the State itself of the Fourteenth Amendment, she would surely be entitled to recover that fee.   We express no opinion as to whether she could prove other damages causally related to the threatened use of the sale provisions.

power delegated to it by the State which is traditionally associated with sovereignty.'" 553 F. 2d, at 770, quoting 419 U. S., at 353. The majority found:

> "[B]y enacting § 7-210, New York not only delegated to the warehouseman a portion of its sovereign monopoly power over binding conflict resolution [citations omitted], but also let him, by selling stored goods, execute a lien and thus perform a function which has traditionally been that of the sheriff." 553 F. 2d, at 771.

The court, although recognizing that the Court of Appeals for the Ninth Circuit had reached a contrary conclusion in dealing with an identical California statute in *Melara* v. *Kennedy*, 541 F. 2d 802 (1976), concluded that this delegation of power constituted sufficient state action to support federal jurisdiction under 28 U. S. C. § 1343 (3). The dissenting judge found the reasoning of *Melara* persuasive.

We granted certiorari, 434 U. S. 817, to resolve the conflict over this provision of the Uniform Commercial Code, in effect in 49 States and the District of Columbia, and to address the important question it presents concerning the meaning of "state action" as that term is associated with the Fourteenth Amendment.[4]

## II

A claim upon which relief may be granted to respondents against Flagg Brothers under § 1983 must embody at least two elements. Respondents are first bound to show that they have been deprived of a right "secured by the Constitution and the laws" of the United States. They must secondly show that Flagg Brothers deprived them of this right acting "under color of any statute" of the State of New York. It is clear that these two elements denote two separate areas of

---

[4] Even if there is "state action," the ultimate inquiry in a Fourteenth Amendment case is, of course, whether that action constitutes a denial or deprivation by the State of rights that the Amendment protects.

inquiry. *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 150 (1970).

Respondents allege in their complaints that "the threatened sale of the goods pursuant to New York Uniform Commercial Code § 7–210" is an action under color of state law. App. 14a, 47a. We have previously noted, with respect to a private individual, that "[w]hatever else may also be necessary to show that a person has acted 'under color of [a] statute' for purposes of § 1983, . . . we think it essential that he act with the knowledge of and pursuant to that statute." *Adickes, supra,* at 162 n. 23. Certainly, the complaints can be fairly read to allege such knowledge on the part of Flagg Brothers. However, we need not determine whether any further showing is necessary, since it is apparent that neither respondent has alleged facts which constitute a deprivation of any right "secured by the Constitution and laws" of the United States.

A moment's reflection will clarify the essential distinction between the two elements of a § 1983 action. Some rights established either by the Constitution or by federal law are protected from both governmental and private deprivation. See, *e. g., Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 422–424 (1968) (discussing 42 U. S. C. § 1982). Although a private person may cause a deprivation of such a right, he may be subjected to liability under § 1983 only when he does so under color of law. Cf. 392 U. S., at 424–425, and n. 33. However, most rights secured by the Constitution are protected only against infringement by governments. See, *e. g., Jackson,* 419 U. S., at 349; *Civil Rights Cases,* 109 U. S. 3, 17–18 (1883). Here, respondents allege that Flagg Brothers has deprived them of their right, secured by the Fourteenth Amendment, to be free from state deprivations of property without due process of law. Thus, they must establish not only that Flagg Brothers acted under color of the challenged statute, but also that its actions are properly attributable to the State of New York.

It must be noted that respondents have named no public officials as defendants in this action. The city marshal, who supervised their evictions, was dismissed from the case by the consent of all the parties.[5] This total absence of overt official involvement plainly distinguishes this case from earlier decisions imposing procedural restrictions on creditors' remedies such as *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.,* 419 U. S. 601 (1975); *Fuentes* v. *Shevin,* 407 U. S. 67 (1972); *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337 (1969). In those cases, the Court was careful to point out that the dictates of the Due Process Clause "attac[h] only to the deprivation of an interest encompassed within the Fourteenth Amendment's protection." *Fuentes, supra,* at 84. While as a factual matter any person with sufficient physical power may deprive a person of his property, only a State or a private person whose action "may be fairly treated as that of the State itself," *Jackson, supra,* at 351, may deprive him of "an interest encompassed within the Fourteenth Amendment's protection," *Fuentes, supra,* at 84. Thus, the only issue presented by this case is whether Flagg Brothers' action may fairly be attributed to the State of New York. We conclude that it may not.

### III

Respondents' primary contention is that New York has delegated to Flagg Brothers a power "traditionally exclusively reserved to the State." *Jackson, supra,* at 352. They argue that the resolution of private disputes is a traditional function of civil government, and that the State in § 7–210 has delegated this function to Flagg Brothers. Respondents,

---

[5] Of course, where the defendant is a public official, the two elements of a § 1983 action merge. "The involvement of a state official . . . plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment . . . rights, whether or not the actions of the police were officially authorized, or lawful." *Adickes* v. *S. H. Kress & Co.,* 398 U. S. 144, 152 (1970) (citations omitted).

however, have read too much into the language of our previous cases. While many functions have been traditionally performed by governments, very few have been "exclusively reserved to the State."

One such area has been elections. While the Constitution protects private rights of association and advocacy with regard to the election of public officials, our cases make it clear that the conduct of the elections themselves is an exclusively public function. This principle was established by a series of cases challenging the exclusion of blacks from participation in primary elections in Texas. *Terry* v. *Adams,* 345 U. S. 461 (1953); *Smith* v. *Allwright,* 321 U. S. 649 (1944); *Nixon* v. *Condon,* 286 U. S. 73 (1932). Although the rationale of these cases may be subject to some dispute,[6] their scope is carefully defined. The doctrine does not reach to all forms of private political activity, but encompasses only state-regulated elections or elections conducted by organizations which in practice produce "the uncontested choice of public officials." *Terry, supra,* at 484 (Clark, J., concurring). As Mr. Justice Black described the situation in *Terry, supra,* at 469: "The only election that has counted in this Texas county for more than fifty years has been that held by the Jaybirds from which Negroes were excluded."[7]

A second line of cases under the public-function doctrine originated with *Marsh* v. *Alabama,* 326 U. S. 501 (1946). Just as the Texas Democratic Party in *Smith* and the Jaybird Democratic Association in *Terry* effectively performed the entire public function of selecting public officials, so too the

---

[6] Indeed, the majority in *Terry* produced three separate opinions, none of which commanded a majority of the Court.

[7] In construing the public-function doctrine in the election context, the Court has given special consideration to the fact that Congress, in 42 U. S. C. § 1971 (a) (1), has made special provision to protect equal access to the ballot. *Terry,* 345 U. S., at 468 (opinion of Black, J.); *Smith,* 321 U. S., at 651. No such congressional pronouncement speaks to the ordinary commercial transaction presented here.

Gulf Shipbuilding Corp. performed all the necessary munici-
pal functions in the town of Chickasaw, Ala., which it owned.
Under those circumstances, the Court concluded it was bound
to recognize the right of a group of Jehovah's Witnesses to
distribute religious literature on its streets. The Court ex-
panded this municipal-function theory in *Food Employees* v.
*Logan Valley Plaza, Inc.*, 391 U. S. 308 (1968), to encompass
the activities of a private shopping center. It did so over the
vigorous dissent of Mr. Justice Black, the author of *Marsh*.
As he described the basis of the *Marsh* decision:

> "The question is, Under what circumstances can private
> property be treated as though it were public? The
> answer that *Marsh* gives is when that property has taken
> on *all* the attributes of a town, *i. e.*, 'residential buildings,
> streets, a system of sewers, a sewage disposal plant and a
> "business block" on which business places are situated.'
> 326 U. S., at 502." 391 U. S., at 332 (dissenting opinion).

This Court ultimately adopted Mr. Justice Black's interpre-
tation of the limited reach of *Marsh* in *Hudgens* v. *NLRB*,
424 U. S. 507 (1976), in which it announced the overruling of
*Logan Valley*.

These two branches of the public-function doctrine have in
common the feature of exclusivity.[8] Although the elections
held by the Democratic Party and its affiliates were the only
meaningful elections in Texas, and the streets owned by the

---

[8] Respondents also contend that *Evans* v. *Newton*, 382 U. S. 296 (1966),
establishes that the operation of a park for recreational purposes is an
exclusively public function. We doubt that *Newton* intended to establish
any such broad doctrine in the teeth of the experience of several American
entrepreneurs who amassed great fortunes by operating parks for recrea-
tional purposes. We think *Newton* rests on a finding of ordinary state
action under extraordinary circumstances. The Court's opinion emphasizes
that the record showed "no change in the municipal maintenance and
concern over this facility," *id.*, at 301, after the transfer of title to private
trustees. That transfer had not been shown to have eliminated the actual
involvement of the city in the daily maintenance and care of the park.

Gulf Shipbuilding Corp. were the only streets in Chickasaw, the proposed sale by Flagg Brothers under § 7–210 is not the only means of resolving this purely private dispute. Respondent Brooks has never alleged that state law barred her from seeking a waiver of Flagg Brothers' right to sell her goods at the time she authorized their storage. Presumably, respondent Jones, who alleges that she never authorized the storage of her goods, could have sought to replevy her goods at any time under state law. See N. Y. Civ. Prac. Law § 7101 *et seq.* (McKinney 1963). The challenged statute itself provides a damages remedy against the warehouseman for violations of its provisions. N. Y. U. C. C. § 7–210 (9) (McKinney 1964). This system of rights and remedies, recognizing the traditional place of private arrangements in ordering relationships in the commercial world,[9] can hardly be said to have delegated to Flagg Brothers an exclusive prerogative of the sovereign.[10]

---

[9] Unlike the parade of horribles suggested by our Brother STEVENS in dissent, *post,* at 170, this case does not involve state authorization of private breach of the peace.

[10] It is undoubtedly true, as our Brother STEVENS says in dissent, *post,* at 169, that "respondents have a property interest in the possessions that the warehouseman proposes to sell." But that property interest is not a monolithic, abstract concept hovering in the legal stratosphere. It is a bundle of rights in personalty, the metes and bounds of which are determined by the decisional and statutory law of the State of New York. The validity of the property interest in these possessions which respondents previously acquired from some other private person depends on New York law, and the manner in which that same property interest in these same possessions may be lost or transferred to still another private person likewise depends on New York law. It would intolerably broaden, beyond the scope of any of our previous cases, the notion of state action under the Fourteenth Amendment to hold that the mere existence of a body of property law in a State, whether decisional or statutory, itself amounted to "state action" even though no state process or state officials were ever involved in enforcing that body of law.

This situation is clearly distinguishable from cases such as *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.,* 419 U. S. 601 (1975); *Fuentes* v. *Shevin,*

Whatever the particular remedies available under New York law, we do not consider a more detailed description of them necessary to our conclusion that the settlement of disputes between debtors and creditors is not traditionally an exclusive public function.[11]  Cf. *United States* v. *Kras*, 409

407 U. S. 67 (1972); and *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337 (1969).  In each of those cases a government official participated in the physical deprivation of what had concededly been the constitutional plaintiff's property under state law before the deprivation occurred.  The constitutional protection attaches not because, as in *North Georgia Finishing*, a clerk issued a ministerial writ out of the court, but because as a result of that writ the property of the debtor was seized and impounded by the affirmative command of the law of Georgia.  The creditor in *North Georgia Finishing* had not simply sought to pursue the collection of his debt by private means permissible under Georgia law; he had invoked the authority of the Georgia court, which in turn had ordered the garnishee not to pay over money which previously had been the property of the debtor.  See *Virginia* v. *Rives*, 100 U. S. 313, 318 (1880); *Shelley* v. *Kraemer*, 334 U. S. 1 (1948).

The "consent" inquiry in *Fuentes* occurred only after the Court had concluded that state action for purposes of the Fourteenth Amendment was supplied by the participation in the seizure on the part of the sheriff.  The consent inquiry was directed to whether there had been a waiver of the constitutional right to due process which had been triggered by state deprivation of property.  But our Brother Stevens puts the cart before the horse; he concludes that the respondents' lack of consent to the deprivations triggers affirmative constitutional protections which the State is bound to provide.  Thus what was a mere coda to the constitutional analysis in *Fuentes* becomes the major theme of the dissent.

[11] It may well be, as my Brother Stevens' dissent contends, that "[t]he power to order legally binding surrenders of property and the constitutional restrictions on that power are necessary correlatives in our system."  *Post*, at 178–179.  But here New York, unlike Florida in *Fuentes*, Georgia in *North Georgia Finishing*, and Wisconsin in *Sniadach*, has not ordered respondents to surrender any property whatever.  It has merely enacted a statute which provides that a warehouseman conforming to the provisions of the statute may convert his traditional lien into good title.  There is no reason whatever to believe that either Flagg Brothers or respondents could not, if they wished, seek resort to the New York courts in order to either compel or prevent the "surrenders of property" to which that dissent refers, and that

U. S. 434, 445–446 (1973). Creditors and debtors have had available to them historically a far wider number of choices than has one who would be an elected public official, or a member of Jehovah's Witnesses who wished to distribute literature in Chickasaw, Ala., at the time *Marsh* was decided. Our analysis requires no parsing of the difference between various commercial liens and other remedies to support the conclusion that this entire field of activity is outside the scope of *Terry* and *Marsh*.[12] This is true whether these commercial rights and remedies are created by statute or decisional law. To rely upon the historical antecedents of a

---

the compliance of Flagg Brothers with applicable New York property law would be reviewed after customary notice and hearing in such a proceeding.

The fact that such a judicial review of a self-help remedy is seldom encountered bears witness to the important part that such remedies have played in our system of property rights. This is particularly true of the warehouseman's lien, which is the source of this provision in the Uniform Commercial Code which is the law in 49 States and the District of Columbia. The lien in this case, particularly because it is burdened by procedural constraints and provides for a compensatory remedy and judicial relief against abuse, is not atypical of creditors' liens historically, whether created by statute or legislatively enacted. The conduct of private actors in relying on the rights established under these liens to resort to self-help remedies does not permit their conduct to be ascribed to the State. Cf. *Steele* v. *Louisville & Nashville R. Co.*, 323 U. S. 192 (1944); *Railway Employees' Dept.* v. *Hanson*, 351 U. S. 225 (1956).

[12] This is not to say that dispute resolution between creditors and debtors involves a category of human affairs that is never subject to constitutional constraints. We merely address the public-function doctrine as respondents would apply it to this case.

Self-help of the type involved in this case is not significantly different from creditor remedies generally, whether created by common law or enacted by legislatures. New York's statute has done nothing more than authorize (and indeed limit)—without participation by any public official—what Flagg Brothers would tend to do, even in the absence of such authorization, *i. e.*, dispose of respondents' property in order to free up its valuable storage space. The proposed sale pursuant to the lien in this case is not a significant departure from traditional private arrangements.

particular practice would result in the constitutional condemnation in one State of a remedy found perfectly permissible in another. Compare *Cox Bakeries* v. *Timm Moving & Storage,* 554 F. 2d 356, 358–359 (CA8 1977), with *Melara,* 541 F. 2d, at 805–806, and n. 7. Cf. *Bell* v. *Maryland,* 378 U. S. 226, 334–335 (1964) (Black, J., dissenting).[13]

Thus, even if we were inclined to extend the sovereign-function doctrine outside of its present carefully confined bounds, the field of private commercial transactions would be a particularly inappropriate area into which to expand it. We conclude that our sovereign-function cases do not support a finding of state action here.

Our holding today impairs in no way the precedential value of such cases as *Norwood* v. *Harrison,* 413 U. S. 455 (1973), or *Gilmore* v. *City of Montgomery,* 417 U. S. 556 (1974), which arose in the context of state and municipal programs which benefited private schools engaging in racially discriminatory admissions practices following judicial decrees desegregating public school systems. And we would be remiss if we did not note that there are a number of state and municipal functions not covered by our election cases or governed by the reasoning of *Marsh* which have been administered with a greater degree of exclusivity by States and municipalities than has the function of so-called "dispute resolution." Among these are such functions as education, fire and police protection, and tax collection.[14] We express no view as to the extent,

---

[13] See also *Davis* v. *Richmond,* 512 F. 2d 201, 203 (CA1 1975):

"[W]e are disinclined to decide the issue of state involvement on the basis of whether a particular class of creditor did or did not enjoy the same freedom to act in Elizabethan or Georgian England."

[14] Contrary to MR. JUSTICE STEVENS' suggestion, *post,* at 172 n. 8, this Court has never considered the private exercise of traditional police functions. In *Griffin* v. *Maryland,* 378 U. S. 130 (1964), the State contended that the deputy sheriff in question had acted only as a private security employee, but this Court specifically found that he "purported to exercise the authority of a deputy sheriff." *Id.,* at 135. *Griffin* thus sheds

if any, to which a city or State might be free to delegate to private parties the performance of such functions and thereby avoid the strictures of the Fourteenth Amendment. The mere recitation of these possible permutations and combinations of factual situations suffices to caution us that their resolution should abide the necessity of deciding them.

## IV

Respondents further urge that Flagg Brothers' proposed action is properly attributable to the State because the State has authorized and encouraged it in enacting § 7–210. Our cases state "that a State is responsible for the . . . act of a private party when the State, by its law, has compelled the act." *Adickes*, 398 U. S., at 170. This Court, however, has never held that a State's mere acquiescence in a private action converts that action into that of the State. The Court rejected a similar argument in *Jackson*, 419 U. S., at 357:

> "Approval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice *by ordering it,* does not transmute a practice initiated by the utility and approved by the commission into 'state action.'" (Emphasis added.)

The clearest demonstration of this distinction appears in *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163 (1972), which held that the Commonwealth of Pennsylvania, although not responsible for racial discrimination voluntarily practiced by a private club, could not by law require the club to comply with its own discriminatory rules. These cases clearly rejected the notion that our prior cases permitted the imposition of Fourteenth Amendment restraints on private action by the simple device of characterizing the State's inaction as "authoriza-

---

no light on the constitutional status of private police forces, and we express no opinion here.

tion" or "encouragement." See *id.*, at 190 (BRENNAN, J., dissenting).

It is quite immaterial that the State has embodied its decision not to act in statutory form. If New York had no commercial statutes at all, its courts would still be faced with the decision whether to prohibit or to permit the sort of sale threatened here the first time an aggrieved bailor came before them for relief. A judicial decision to deny relief would be no less an "authorization" or "encouragement" of that sale than the legislature's decision embodied in this statute. It was recognized in the earliest interpretations of the Fourteenth Amendment "that a State may act through different agencies,—either by its legislative, its executive, or its judicial authorities; and the prohibitions of the amendment extend to all action of the State" infringing rights protected thereby. *Virginia* v. *Rives,* 100 U. S. 313, 318 (1880). If the mere denial of judicial relief is considered sufficient encouragement to make the State responsible for those private acts, all private deprivations of property would be converted into public acts whenever the State, for whatever reason, denies relief sought by the putative property owner.

Not only is this notion completely contrary to that "essential dichotomy," *Jackson, supra,* at 349, between public and private acts, but it has been previously rejected by this Court. In *Evans* v. *Abney,* 396 U. S. 435, 458 (1970), our Brother BRENNAN in dissent contended that a Georgia statutory provision authorizing the establishment of trusts for racially restricted parks conferred a "special power" on testators taking advantage of the provision. The Court nevertheless concluded that the State of Georgia was in no way responsible for the purely private choice involved in that case. By the same token, the State of New York is in no way responsible for Flagg Brothers' decision, a decision which the State in § 7–210 permits but does not compel, to threaten to sell these respondents' belongings.

Here, the State of New York has not compelled the sale of a bailor's goods, but has merely announced the circumstances under which its courts will not interfere with a private sale. Indeed, the crux of respondents' complaint is not that the State *has* acted, but that it has refused to act. This statutory refusal to act is no different in principle from an ordinary statute of limitations whereby the State declines to provide a remedy for private deprivations of property after the passage of a given period of time.

We conclude that the allegations of these complaints do not establish a violation of these respondents' Fourteenth Amendment rights by either petitioner Flagg Brothers or the State of New York. The District Court properly concluded that their complaints failed to state a claim for relief under 42 U. S. C. § 1983. The judgment of the Court of Appeals holding otherwise is

*Reversed.*

Mr. Justice Brennan took no part in the consideration or decision of these cases.

Mr. Justice Marshall, dissenting.

Although I join my Brother Stevens' dissenting opinion, I write separately to emphasize certain aspects of the majority opinion that I find particularly disturbing.

I cannot remain silent as the Court demonstrates, not for the first time, an attitude of callous indifference to the realities of life for the poor. See, *e. g., Beal* v. *Doe,* 432 U. S. 438, 455–457 (1977) (Marshall, J., dissenting); *United States* v. *Kras,* 409 U. S. 434, 458–460 (1973) (Marshall, J., dissenting). It blandly asserts that "respondent Jones . . . could have sought to replevy her goods at any time under state law." *Ante,* at 160. In order to obtain replevin in New York, however, respondent Jones would first have had to present to a sheriff an "undertaking" from a surety by which the latter would be bound to pay "not less than twice the value" of the goods involved and perhaps substantially more, depending in

part on the size of the potential judgment against the debtor. N. Y. Civ. Prac. Law § 7102 (e) (McKinney Supp. 1977). Sureties do not provide such bonds without receiving both a substantial payment in advance and some assurance of the debtor's ability to pay any judgment awarded.

Respondent Jones, according to her complaint, took home $87 per week from her job, had been evicted from her apartment, and faced a potential liability to the warehouseman of at least $335, an amount she could not afford. App. 44a–46a. The Court's assumption that respondent would have been able to obtain a bond, and thus secure return of her household goods, must under the circumstances be regarded as highly questionable.* While the Court is technically correct that respondent "could have sought" replevin, it is also true that, given adequate funds, respondent could have paid her rent and remained in her apartment, thereby avoiding eviction and the seizure of her household goods by the warehouseman. But we cannot close our eyes to the realities that led to this litigation. Just as respondent lacked the funds to prevent eviction, it seems clear that, once her goods were seized, she had no practical choice but to leave them with the warehouseman, where they were subject to forced sale for nonpayment of storage charges.

I am also troubled by the Court's cavalier treatment of the place of historical factors in the "state action" inquiry. While we are, of course, not bound by what occurred centuries ago in England, see *ante,* at 163 n. 13, the test adopted by the Court itself requires us to decide what functions have been *"traditionally* exclusively reserved to the State," *Jackson* v. *Metropolitan Edison Co.,* 419 U. S. 345, 352 (1974) (emphasis added). Such an issue plainly cannot be resolved in a historical vacuum. New York's highest court has stated that "[i]n

---

*New York's replevin statutes have been challenged by poor persons on the ground that they violated equal protection because the poor could not obtain the required "undertaking." See *Laprease* v. *Raymours Furniture Co.,* 315 F. Supp. 716 (NDNY 1970) (three-judge court); *Tamburro* v. *Trama,* 59 Misc. 2d 488, 299 N. Y. S. 2d 528 (1969).

[New York] the execution of a lien . . . traditionally has been the function of the Sheriff." *Blye* v. *Globe-Wernicke Realty Co.,* 33 N. Y. 2d 15, 20, 300 N. E. 2d 710, 713–714 (1973). Numerous other courts, in New York and elsewhere, have reached a similar conclusion. See, *e. g., Sharrock* v. *Dell Buick-Cadillac, Inc.,* 56 App. Div. 2d 446, 455, 393 N. Y. S. 2d 166, 171 (1977) ("[T]he garageman in executing his lien . . . is performing the traditional function of the Sheriff and is clothed with the authority of State law"); *Parks* v. *"Mr. Ford,"* 556 F. 2d 132, 141 (CA3 1977) (en banc) ("Pennsylvania has quite literally delegated to private individuals, [forced-sale] powers 'traditionally exclusively reserved' to sheriffs and constables"); *Cox Bakeries, Inc.* v. *Timm Moving & Storage, Inc.,* 554 F. 2d 356, 358 (CA8 1977) (Clark, J.) (by giving a warehouseman forced-sale powers, "the state has delegated the traditional roles of judge, jury and sheriff"); *Hall* v. *Garson,* 430 F. 2d 430, 439 (CA5 1970) ("The execution of a lien . . . has in Texas traditionally been the function of the Sheriff or constable").

By ignoring this history, the Court approaches the question before us as if it can be decided without reference to the role that the State has always played in lien execution by forced sale. In so doing, the Court treats the State as if it were, to use the Court's words, "a monolithic, abstract concept hovering in the legal stratosphere." *Ante,* at 160 n. 10. The state-action doctrine, as developed in our past cases, requires that we come down to earth and decide the issue here with careful attention to the State's traditional role.

I dissent.

Mr. Justice Stevens, with whom Mr. Justice White and Mr. Justice Marshall join, dissenting.

Respondents contend that petitioner Flagg Brothers' proposed sale of their property to third parties will violate the Due Process Clause of the Fourteenth Amendment. Assum-

ing, *arguendo,* that the procedure to be followed would be inadequate if the sale were conducted by state officials, the Court holds that respondents have no federal protection because the case involves nothing more than a *private* deprivation of their property without due process of law. In my judgment the Court's holding is fundamentally inconsistent with, if not foreclosed by, our prior decisions which have imposed procedural restrictions on the State's authorization of certain creditors' remedies. See *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.,* 419 U. S. 601; *Fuentes* v. *Shevin,* 407 U. S. 67; *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337.

There is no question in this case but that respondents have a property interest in the possessions that the warehouseman proposes to sell.[1] It is also clear that, whatever power of sale the warehouseman has, it does not derive from the consent of the respondents.[2] The claimed power derives solely from the State, and specifically from § 7–210 of the New York Uniform Commercial Code. The question is whether a state statute which authorizes a private party to deprive a person of his property without his consent must meet the requirements of the Due Process Clause of the Fourteenth Amendment. This question must be answered in the affirmative unless the State has virtually unlimited power to transfer interests in private property without any procedural protections.[3]

---

[1] Of course the warehouseman may also have a property interest and the ultimate resolution of the due process issue will require a balancing of these interests. See *Mitchell* v. *W. T. Grant Co.,* 416 U. S. 600, 604.

[2] Although the petitioners have at various stages of this case contended that there was an "implied contract" between the warehouseman and respondents providing for the sale of respondents' possessions in satisfaction of a lien, the Court of Appeals rejected this claim, 553 F. 2d 764, 767 n. 3, and petitioners conceded in this Court that, taking respondents' allegations as fact, as we must, there is no contractual issue in this case. Tr. of Oral Arg. 11.

[3] It could be argued that since the State has the power to create property interests, it should also have the power to determine what procedures

In determining that New York's statute cannot be scrutinized under the Due Process Clause, the Court reasons that the warehouseman's proposed sale is solely private action because the state statute *"permits* but does not compel" the sale, *ante,* at 165 (emphasis added), and because the warehouseman has not been delegated a power *"exclusively* reserved to the State," *ante,* at 158 (emphasis added). Under this approach a State could enact laws authorizing private citizens to use self-help in countless situations without any possibility of federal challenge. A state statute could authorize the warehouseman to retain all proceeds of the lien sale, even if they far exceeded the amount of the alleged debt; it could authorize finance companies to enter private homes to repossess merchandise; or indeed, it could authorize "any person with sufficient physical power," *ante,* at 157, to acquire and sell the property of his weaker neighbor. An attempt to challenge the validity of any such outrageous statute would be defeated by the reasoning the Court uses today: The Court's rationale would characterize action pursuant to such a statute as purely private action, which the State permits but does not compel, in an area not exclusively reserved to the State.

As these examples suggest, the distinctions between "permission" and "compulsion" on the one hand, and "exclusive" and "nonexclusive," on the other, cannot be determinative factors in state-action analysis. There is no great chasm between "permission" and "compulsion" requiring particular state action to fall within one or the other definitional camp. Even *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, upon which the Court relies for its distinction between "permission" and

---

should attend the deprivation of those interests. See *Arnett* v. *Kennedy,* 416 U. S. 134, 153–154 (REHNQUIST, J.). Although a majority of this Court has never adopted that position, today's opinion revives the theory in a somewhat different setting by holding that the State can shield its legislation affecting property interests from due process scrutiny by delegating authority to private parties.

"compulsion," recognizes that there are many intervening levels of state involvement in private conduct that may support a finding of state action.[4] In this case, the State of New York, by enacting § 7–210 of the Uniform Commercial Code, has acted in the most effective and unambiguous way a State can act. This section specifically authorizes petitioner Flagg Brothers to sell respondents' possessions; it details the procedures that petitioner must follow; and it grants petitioner the power to convey good title to goods that are now owned by respondents to a third party.[5]

While Members of this Court have suggested that statutory authorization alone may be sufficient to establish state action,[6] it is not necessary to rely on those suggestions in this case because New York has authorized the warehouseman to perform what is clearly a state function. The test of what is a state function for purposes of the Due Process Clause has been variously phrased. Most frequently the issue is presented in terms of whether the State has delegated a function traditionally and historically associated with sovereignty. See, e. g., Jackson v. Metropolitan Edison Co., 419 U. S. 345, 353; Evans v. Newton, 382 U. S. 296, 299. In this Court, petitioners have attempted to argue that the nonconsensual trans-

---

[4] In *Moose Lodge* the Court found state action on the basis of the Liquor Control Board's regulation which required that "[e]very club licensee shall adhere to all of the provisions of its Constitution and By-Laws." As the Court recognized, this regulation was neutral on its face, see 407 U. S., at 178, and did not *compel* the Lodge to adopt a discriminatory membership rule.

[5] In fact, § 7–210 (5) (1964) provides:

"A purchaser in good faith of goods sold to enforce a warehouseman's lien takes the goods free of any rights of persons against whom the lien was valid, despite noncompliance by the warehouseman with the requirements of this section."

[6] See, e. g., Burton v. Wilmington Parking Authority, 365 U. S. 715, 726 (STEWART, J., concurring); id., at 727 (Frankfurter, J., dissenting); and id., at 729 (Harlan, J., dissenting).

fer of property rights is not a traditional function of the sovereign. The overwhelming historical evidence is to the contrary, however,[7] and the Court wisely does not adopt this position. Instead, the Court reasons that state action cannot be found because the State has not delegated to the warehouseman an *exclusive* sovereign function.[8] This distinction, how-

---

[7] The New York State courts have recognized that the execution of a lien is a traditional function of the State. See *Blye* v. *Globe-Wernicke Realty Co.*, 33 N. Y. 2d 15, 20, 300 N. E. 2d 710, 713–714 (1973). See also 3 W. Blackstone, Commentaries §§ 7–11, pp. *3–6, which notes that the right of self-help at common law was severely limited.

I fully agree with the Court that the decision of whether or not a statute is subject to due process scrutiny should not depend on " 'whether a particular class of creditor did or did not enjoy the same freedom to act in Elizabethan or Georgian England.' " *Ante,* at 163 n. 13 (citation omitted). Nonetheless some reference to history and well-settled practice is necessary to determine whether a particular action is a "traditional state function." See *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345. Indeed, in *Jackson* the Court specifically referred to Pennsylvania decisions, rendered in 1879 and 1898, which had rejected the contention that the furnishing of utility services was a state function. *Id.,* at 353.

[8] See *ante,* at 157–158. As I understand the Court's notion of "exclusivity," the sovereign function here is not exclusive because there may be other state remedies, under different statutes or common-law theories, available to respondents. *Ante,* at 159–160. Even if I were to accept the notion that sovereign functions must be "exclusive," the Court's description of exclusivity is incomprehensible. The question is whether a particular action is a uniquely sovereign function, not whether state law forecloses any possibility of recovering for damages for such activity. For instance, it is clear that the maintenance of a police force is a unique sovereign function, and the delegation of police power to a private party will entail state action. See *Griffin* v. *Maryland,* 378 U. S. 130. Under the Court's analysis, however, there would be no state action if the State provided a remedy, such as an action for wrongful imprisonment, for the individual injured by the "private" policeman. This analysis is not based on "exclusivity," but on some vague, and highly inappropriate, notion that respondents should not complain about this state statute if the State offers them a glimmer of hope of redeeming their possessions, or at least the value of the goods, through some other state action. Of course, the availability

ever, is not consistent with our prior decisions on state action; [9] is not even adhered to by the Court in this case; [10] and, most importantly, is inconsistent with the line of cases beginning with *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337.

Since *Sniadach* this Court has scrutinized various state statutes regulating the debtor-creditor relationship for compliance with the Due Process Clause. See also *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.*, 419 U. S. 601; *Mitchell* v. *W. T. Grant Co.*, 416 U. S. 600; *Fuentes* v. *Shevin*, 407 U. S. 67. In each of these cases a finding of state action was a prerequisite to the Court's decision. The Court today seeks to explain these findings on the ground that in each case there was some element of "overt official involvement." *Ante*, at 157. Given the facts of those cases, this explanation is baffling. In *North Georgia Finishing*, for instance, the official involvement of the State of Georgia consisted of a court clerk who issued a writ of garnishment based solely on the affidavit of the creditor. 419 U. S., at 607. The clerk's actions were purely ministerial, and, until today, this Court had never held that purely minis-

---

of other state remedies may be relevant in determining whether the statute provides sufficient procedural protections under the Due Process Clause, but it is not relevant to the state-action issue.

[9] The Court, for instance, attempts to distinguish *Evans* v. *Newton*, 382 U. S. 296. *Newton* concededly involved a function which is not exclusively sovereign—the operation of a park, but the Court claims that *Newton* actually rested on a determination that the city was still involved in the "daily maintenance and care of the park." *Ante*, at 159 n. 8. This stark attempt to rewrite the rationale of the *Newton* opinion is fully answered by MR. JUSTICE WHITE's opinion in that case. MR. JUSTICE WHITE observed:

"It is . . . evident that the record does not show continued involvement of the city in the operation of the park—the record is silent on this point." 382 U. S., at 304.

[10] As the Court is forced to recognize, its notion of exclusivity simply cannot be squared with the wide range of functions that are typically considered sovereign functions, such as "education, fire and police protection, and tax collection." *Ante*, at 163.

terial acts of "minor governmental functionaries" were suffi-
cient to establish state action.[11]    The suggestion that this was
the basis for due process review in *Sniadach, Shevin,* and
*North Georgia Finishing* marks a major and, in my judgment,
unwise expansion of the state-action doctrine.    The number of
private actions in which a governmental functionary plays
some ministerial role is legion; [12] to base due process review on
the fortuity of such governmental intervention would demean
the majestic purposes of the Due Process Clause.

Instead, cases such as *North Georgia Finishing* must be
viewed as reflecting this Court's recognition of the significance
of the State's role in defining *and controlling* the debtor-
creditor relationship.    The Court's language to this effect in
the various debtor-creditor cases has been unequivocal.    In
*Fuentes* v. *Shevin* the Court stressed that the statutes in ques-
tion "abdicate[d] effective state control over state power."
407 U. S., at 93.    And it is clear that what was of concern in
*Shevin* was the *private* use of state power to achieve a non-
consensual resolution of a commercial dispute.    The state
statutes placed the state power to repossess property in the
hands of an interested private party, just as the state statute
in this case places the state power to conduct judicially bind-
ing sales in satisfaction of a lien in the hands of the
warehouseman.

"Private parties, serving their own private advantage,

---

[11] See, *e. g., Parks* v. *"Mr. Ford,"* 556 F. 2d 132, 148 (CA3 1977)
(en banc) (Adams, J., concurring); *Gibbs* v. *Titelman,* 502 F. 2d 1107,
1113 n. 17 (CA3 1974), cert. denied *sub nom. Gibbs* v. *Garver,* 419 U. S.
1039; *Shirley* v. *State Nat. Bank of Connecticut,* 493 F. 2d 739, 743 n. 5
(CA2 1974).

[12] For instance, state officials often perform ministerial acts in the trans-
ferring of ownership in motor vehicles or real estate.    See Burke & Reber,
State Action, Congressional Power and Creditors' Rights: An Essay on
The Fourth Amendment, 47 S. Cal. L. Rev. 1, 19–23 (1973).    It is diffi-
cult to believe that the Court would hold that all car sales are invested
with state action.    See *Parks* v. *"Mr. Ford,"* supra, at 141.

may unilaterally invoke state power to replevy goods from another. No state official participates in the decision to seek a writ; no state official reviews the basis for the claim to repossession; and no state official evaluates the need for immediate seizure. There is not even a requirement that the plaintiff provide any information to the court on these matters." *Ibid.*

This same point was made, equally emphatically, in *Mitchell* v. *W. T. Grant Co.*, *supra*, at 614–616, and *North Georgia Finishing*, *supra*, at 607. Yet the very defect that made the statutes in *Shevin* and *North Georgia Finishing* unconstitutional—lack of state control—is, under today's decision, the factor that precludes constitutional review of the state statute. The Due Process Clause cannot command such incongruous results. If it is unconstitutional for a State to allow a private party to exercise a traditional state power because the state supervision of that power is purely mechanical, the State surely cannot immunize its actions from constitutional *scrutiny* by removing even the mechanical supervision.

Not only has the State removed its nominal supervision in this case,[13] it has also authorized a private party to exercise a governmental power that is at least as significant as the power exercised in *Shevin* or *North Georgia Finishing*. In *Shevin*, the Florida statute allowed the debtor's property to be seized and held pending the outcome of the creditor's action for repossession. The property would not be finally disposed of until there was an adjudication of the underlying claim. Similarly, in *North Georgia Finishing*, the state statute provided for a garnishment procedure which deprived the debtor of the use of property in the garnishee's hands pending the outcome of litigation. The warehouseman's power under § 7–210 is far broader, as the Court of Appeals pointed out:

---

[13] Of course, the State does "supervise" the warehouseman's actions in the sense that it prescribes the procedures that warehousemen must follow to complete a legally binding sale.

"After giving the bailor specified notice, . . . the warehouseman is entitled to sell the stored goods in satisfaction of whatever he determines the storage charges to be. The warehouseman, unquestionably an interested party, is thus authorized by law to resolve any disputes over storage charges finally and unilaterally." 553 F. 2d 764, 771.

Whether termed "traditional," "exclusive," or "significant," the state power to order binding, nonconsensual resolution of a conflict between debtor and creditor is exactly the sort of power with which the Due Process Clause is concerned. And the State's delegation of that power to a private party is, accordingly, subject to due process scrutiny. This, at the very least, is the teaching of *Sniadach, Shevin,* and *North Georgia Finishing.*

It is important to emphasize that, contrary to the Court's apparent fears, this conclusion does not even remotely suggest that "all private deprivations of property [will] be converted into public acts whenever the State, for whatever reason, denies relief sought by the putative property owner." *Ante,* at 165. The focus is not on the private deprivation but on the state authorization. "[W]hat is always vital to remember is that it is the *state's* conduct, whether action or inaction, not the *private* conduct, that gives rise to constitutional attack." Friendly, The Dartmouth College Case and The Public-Private Penumbra, 12 Texas Quarterly, No. 2, p. 17 (1969) (Supp.) (emphasis in original). The State's conduct in this case takes the concrete form of a statutory enactment, and it is that statute that may be challenged.

My analysis in this case thus assumes that petitioner Flagg Brothers' proposed sale will conform to the procedure specified by the state legislature and that respondents' challenge therefore will be to the constitutionality of that process. It is only what the State itself has enacted that they may ask the federal court to review in a § 1983 case. If there should be a deviation from the state statute—such as a failure to give the

notice required by the state law—the defect could be remedied by a state court and there would be no occasion for § 1983 relief. This point has been well established ever since this Court's first explanations of the state-action doctrine in the *Civil Rights Cases,* 109 U. S. 3, 17:

> "[C]ivil rights, such as are guaranteed by the Constitution against State aggression, cannot be impaired by the wrongful acts of individuals, unsupported by State authority in the shape of laws, customs, or judicial or executive proceedings. The wrongful act of an individual, unsupported by any such authority, is simply a private wrong, or a crime of that individual; . . . but if not sanctioned in some way by the State, or not done under State authority, his rights remain in full force, and may presumably be vindicated by resort to the laws of the State for redress." [14]

On the other hand, if there is compliance with the New York statute, the state legislative action which enabled the deprivation to take place must be subject to constitutional challenge in a federal court.[15] Under this approach, the federal courts do not have jurisdiction to review every foreclosure proceeding in which the debtor claims that there has been a procedural defect constituting a denial of due process of law. Rather, the federal district court's jurisdiction under

---

[14] Furthermore, if the warehouseman has deviated from the statutory requirements, the statute would not provide him with the kind of support that would justify the conclusion that he acted "under color of law." With respect to this requirement of § 1983, while I agree with the majority that the concepts of "under color of law" and "state action" may be separately analyzed, see *Lucas* v. *Wisconsin Electric Co.,* 466 F. 2d 638, 654–655 (CA7 1972), normally as a practical matter they embody the same test of state involvement. See *United States* v. *Price,* 383 U. S. 787, 794 n. 7.

[15] Indeed, under the Court's analysis as I understand it, the state statute in this case would not be subject to due process scrutiny in a *state* court.

§ 1983 is limited to challenges to the constitutionality of the state procedure itself—challenges of the kind considered in *North Georgia Finishing* and *Shevin.*

Finally, it is obviously true that the overwhelming majority of disputes in our society are resolved in the private sphere. But it is no longer possible, if it ever was, to believe that a sharp line can be drawn between private and public actions.[16] The Court today holds that our examination of state delegations of power should be limited to those rare instances where the State has ceded one of its "exclusive" powers. As indicated, I believe that this limitation is neither logical nor practical. More troubling, this description of what is state action does not even attempt to reflect the concerns of the Due Process Clause, for the state-action doctrine is, after all, merely one aspect of this broad constitutional protection.

In the broadest sense, we expect government "to provide a reasonable and fair framework of rules which facilitate commercial transactions . . . ." *Mitchell* v. *W. T. Grant Co.,* 416 U. S., at 624 (POWELL, J., concurring). This "framework of rules" is premised on the assumption that the State will control nonconsensual deprivations of property and that the State's control will, in turn, be subject to the restrictions of the Due Process Clause.[17] The power to order legally bind-

---

[16] See, *e. g.,* Thompson, Piercing the Veil of State Action: The Revisionist Theory and A Mythical Application To Self-Help Repossession, 1977 Wis. L. Rev. 1; Glennon & Nowak, A Functional Analysis of the Fourteenth Amendment "State Action" Requirement, 1976 S. Ct. Rev. 221; Black, Foreword: "State Action," Equal Protection, and California's Proposition 14, 81 Harv. L. Rev. 69 (1967); Williams, The Twilight of State Action, 41 Texas L. Rev. 347 (1963); Van Alstyne & Karst, State Action, 14 Stan. L. Rev. 3 (1961).

[17] Mr. Justice Harlan explained this principle as follows:

"American society, of course, bottoms its systematic definition of individual rights and duties, as well as its machinery for dispute settlement, not on custom or the will of strategically placed individuals, but on the common-law model. It is to courts, or other quasi-judicial official bodies, that we ultimately look for the implementation of a regularized, orderly

ing surrenders of property and the constitutional restrictions on that power are necessary correlatives in our system. In effect, today's decision allows the State to divorce these two elements by the simple expedient of transferring the implementation of its policy to private parties. Because the Fourteenth Amendment does not countenance such a division of power and responsibility, I respectfully dissent.

---

process of dispute settlement. Within this framework, those who wrote our original Constitution, in the Fifth Amendment, and later those who drafted the Fourteenth Amendment, recognized the centrality of the concept of due process in the operation of this system. Without this guarantee that one may not be deprived of his rights, neither liberty nor property, without due process of law, the State's monopoly over techniques for binding conflict resolution could hardly be said to be acceptable under our scheme of things. Only by providing that the social enforcement mechanism must function strictly within these bounds can we hope to maintain an ordered society that is also just. It is upon this premise that this Court has through years of adjudication put flesh upon the due process principle." *Boddie* v. *Connecticut*, 401 U. S. 371, 375.