Moyer, C.J.,
dissenting.
*347 {¶ 44} I respectfully dissent. In State ex rel. Oriana House, Inc. v. Montgomery, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, this court adopted the functional-equivalency test and listed four factors to analyze in determining whether a private entity is a public office for purposes of the Public Records Act, R.C. 149.43. Id., syllabus. While I agreed with the adoption of the functional-equivalency test, I dissented in Oriana House because I disagreed with the application of the test to the facts in that case. Id. at ¶ 39.
{¶ 45} In my dissent, I also disagreed with the majority’s failure to give guidance as to the appropriate balancing of the different factors, id. at ¶ 41, and expressed my view that the second factor, the level of government funding, should be given more weight than other factors, id. at ¶ 46.
{¶ 46} In this case, as in Oriana House, I disagree with the conclusion of the majority that the application of the functional-equivalency test supports a finding that the custodian of the records, here Nova Behavioral Health, Inc. (“Nova”), is not a public office for purposes of the Public Records Act.
{¶ 47} I would apply the four-part functional-equivalency test to Nova as follows:
{¶ 48} 1. Governmental Function. As stated in the majority opinion, pursuant to its contract with the Stark County Community Mental Health Board (“Stark County CMHB”), Nova was obligated to provide mental-health services to residents of Stark County and others who qualified for coverage under the community mental-health plan, regardless of community members’ ability to pay for the services. The majority applied the reasoning articulated in Oriana House to the facts of this case. In Oriana House, the majority found that Oriana House, a private entity operating a community-based correctional facility, was performing a “historically” and “uniquely” governmental function. Id. at ¶ 28. According to the majority in this case, the provision of mental-health services is not “ ‘a power which has traditionally been exclusively reserved to the state.’ ” Id. at ¶ 27, quoting Wolotsky v. Huhn (C.A.6, 1992), 960 F.2d 1331, 1335.
{¶ 49} I disagree with the majority’s finding that the provision of mental-health services has not been “traditionally” or “historically” the function of the state. The era of establishing state-funded psychiatric hospitals began during the early 19th century. Joanmarie liaría Davoli, No Room at the Inn: How the Federal Medicaid Program Created Inequities in Psychiatric Hospital Access for the Indigent Mentally 111, 29 Am. Journal of Law & Medicine (2003) 159, 168. In the 1840s, a reform movement to improve care of the mentally ill resulted in major investments by states in the building and maintenance of psychiatric hospitals. Id.
{¶ 50} Further, the 1965 legislative history of Medicaid reveals legislators’ perception that treatment of the mentally ill was the responsibility of the states: *348 “The committee believes that responsibility for the treatment of persons in mental hospitals * * * is that of the mental health agency of the State.” Senate Report No. 404 (Finance Committee, 1965), reprinted in 1965 U.S.Code Cong. & Adm. News, 1943, 2086, quoted in id. at 169. Following the development of Medicaid and the Medicaid exclusion of the majority of adults in psychiatric hospitals from its reimbursement program, states began to vastly reduce the number of institutionalized patients. Id. at 169-170. Since 1955, the removal of patients from state hospitals has depopulated them by approximately 93 percent. Id. at 174.
{¶ 51} With mentally ill patients no longer housed in state hospitals, community mental-health care has increased dramatically. Between 1981 and 1997, state psychiatric hospital expenditures decreased by 42.8 percent, while community mental-health spending increased by 58.9 percent. National Association of State Mental Health Program Directors Research Institute, Inc., State Profile Highlight, Closing and Reorganizing State Psychiatric Hospitals: 2000 (Aug. 10, 2000), at http://www.nri-inc.org/SH_RPT.pdf (accessed Dec. 6, 2006). In fiscal 1997, expenditures controlled by state mental-health agencies for community mental-health services exceeded expenditures on state psychiatric hospital inpatient services by $2.5 billion. Id.
{¶ 52} A historical review of Ohio statutes supports the conclusion that the state of Ohio once assumed responsibility as the primary provider of care to the mentally ill. G.C. 1890-2 stated the purpose of the act that created the Division of Mental Diseases: “to provide humane and medical treatment and care, preventive and curative, for mentally ill, insane, feeble-minded, and epileptic persons.” 1937 Am.Sub.H.B. No. 545, 117 Ohio Laws 550. G.C. 1890-14 stated, “The state of Ohio shall have the care, custody, control and treatment of all persons mentally ill or insane, and of each person who shall be received into any hospital or institution under the control of this division. Except as provided in this act, no county, city or political subdivision shall establish or maintain any institution, hospital or home for the care, control and treatment of the mentally ill or insane.” (Emphasis added.) Id.
{¶ 53} While family members and some private hospitals have also cared for the mentally ill over the last two centuries, this fact does not illuminate whether the provision of care for the mentally ill is a government function. Specifically, I disagree with the use of the word “exclusively” in the majority’s reasoning. Evidence supports the conclusion that providing mental-health care for the mentally ill is a role that historically has been assumed by the state.
{¶ 54} In Flagg Bros., Inc. v. Brooks (1978), 436 U.S. 149, 172, 98 S.Ct. 1729, 56 L.Ed.2d 185, Justice Stevens dissented from a majority opinion that determined whether certain acts were state action for purposes of the Due Process Clause: *349 “[T]he Court reasons that state action cannot be found because the State has not delegated * * * an exclusive sovereign function.” (Emphasis sic.) In disagreeing with the majority, Justice Stevens argued that the term “exclusive” was misused: “Whether termed ‘traditional,’ ‘exclusive,’ or ‘significant,’ the state power [at issue in Flagg Brothers] is exactly the sort of power with which the Due Process Clause is concerned.” Id. at 176, 98 S.Ct. 1729, 56 L.Ed.2d 185. While this case involves a different question of state action and state power, I agree with Justice Stevens’s sentiments: whether the government function is termed “traditional,” “historical,” or “exclusive,” the fact is that here the state assumed the responsibility of being the only provider of mental-health services to any Ohio citizen in need of those services.
{¶ 55} Though the majority does agree with the relator, the Repository, that the aspect of Nova providing mental-health care for the uninsured and others who are unable to pay is a government function, I think the evidence under the first prong of the functional-equivalency test is much stronger. Here, Nova was providing a service historically provided by the state of Ohio, and I believe that the evidence under this prong of the functional-equivalency test is in full support of finding Nova to be a public office for purposes of the Public Records Act.
{¶ 56} 2. Level of Government Funding. I agree that the fact that an entity receives public funds does not necessarily mean that the entity is a public office for purposes of the Public Records Act. State ex rel. Strothers v. Wertheim (1997), 80 Ohio St.3d 155, 161, 684 N.E.2d 1239 (Moyer, C.J., dissenting).
{¶ 57} Nevertheless, the level of government funding is a most important factor and should be given more weight than other factors in the functional-equivalency test. Oriana House, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at ¶ 46 (Moyer, C.J., dissenting). A private entity that receives the level of public funding that Nova received should not be permitted to keep the public from knowing how it has managed its public responsibilities. Id. at ¶ 47.
{¶ 58} Ninety-two percent of Nova’s revenue from mental-health services came from its contract with the Stark County CMHB. Further, the Stark County CMHB received two-thirds of its $30.1 million total revenue from state and local tax funding. As stated by the majority: “The level of government funding is therefore significant, especially considering that Nova ceased its operations because of the loss of most of its revenues from the contract with the Stark County CMHB.” ¶33.
{¶ 59} 3. Extent of Government Involvement or Regulation. I do not dispute the majority’s conclusion that Nova was a self-directed, independent, private corporation. I also agree that the Stark County CMHB did not control the day-to-day operation of Nova. Nevertheless, I do not agree that these facts require a finding that the government did not extensively regulate Nova.
*350 {¶ 60} Under R.C. 340.03(A)(1), an alcohol, drug-addiction, and mental-health services board (“ADAMH board”) shall “[s]erve as the community mental health planning agency for the county or counties under its jurisdiction.” As one of its duties, an ADAMH board must “[ejnter into contracts with public and private facilities for the operation of facility services included in the board’s community mental health plan.” R.C. 340.03(A)(8)(a). The ADAMH board must “[ajudit * * * at least annually all programs and services provided under contract with the board.” R.C. 340.03(A)(6).
{¶ 61} The contract between the Stark County CMHB and Nova highlights the extent of regulation exercised by the Stark County CMHB. Under Section 6.3, Nova was required to make available to the Stark County CMHB all records and data pertaining to payments, claims, and services rendered under the agreement. Sections 7.1 and 7.2 of the contract state, “All Provider organizations are expected to perform at agreed upon levels,” and “All Providers are required to measure outcomes with the instruments and in the manner approved by the Board.” Section 8.4 of the contract states: “The Provider [Nova] shall cooperate with the Board in all monitoring and review activities necessary to ensure compliance with the conditions of this agreement, Medicaid requirements and the requirements of the Ohio Department of Mental Health.”
{¶ 62} The contract between the Stark County CMHB and Nova is evidence that the Stark County CMHB extensively regulated Nova’s provision of mental-health services. Nova’s records and data were required to be available to the Stark County CMHB for review, Nova’s standards of performance were established by the Stark County CMHB, and Nova was required to allow the Stark County CMHB to monitor and review its performance in order to ensure that Nova was meeting the requirements imposed by the government. Although Nova was responsible and independent as to its day-to-day operation, the provision of mental-health services was extensively regulated by the government.
{¶ 63} 4. Whether an Entity Was Created by the Government. Here, the facts are straightforward: Nova was created as a private, nonprofit corporation. However, as I stated in Oriana House, I would give this factor very little weight: “Surely even the majority would not hold that a private entity that receives all of its funds from public sources is not a public office. Again, the focus of the test should be upon the importance of public funds to the purposes and work of the private entity.” 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, ¶ 50 (Moyer, C.J., dissenting).
{¶ 64} If we balance the four factors of the functional-equivalency test, the evidence establishes that Nova is the functional equivalent of a public office and, thus, is subject to the Public Records Act. The provision of mental-health services has historically been a function of government, Nova received a vast majority of *351 its funding from public sources, and the provision of mental-health services continues to be heavily regulated by the government. Further, the Public Records Act is to be construed liberally in favor of broad access, and any doubt is to be resolved in favor of disclosing records. State ex rel. Plain Dealer Publishing Co. v. Cleveland, 106 Ohio St.3d 70, 2005-0hio-3807, 831 N.E.2d 987, ¶ 20. In my view, the evidence in this case and our duty to resolve doubt in favor of broad access require the holding that Nova is the functional equivalent of a public office for purposes of the Public Records Act.
Wickens, Herzer, Panza, Cook & Batista Co., Richard D. Panza, William F. Kolis Jr., and Michael R. Niederbaumer, for relator.
Baker, Dublikar, Beck, Wiley & Mathews, John B. Lindamood, and James F. Mathews, for respondent.
Vorys, Sater, Seymour & Pease, L.L.P., G. Ross Bridgman, and Peter A. Lusenhop, urging denial of the writ for amicus curiae, Ohio Council of Behavioral Health Providers.
{¶ 65} Therefore, because I would grant the writ of mandamus requested by the Repository and hold that Nova is the functional equivalent of a public office and thus subject to the Public Records Act, I respectfully dissent.
O’Connor and O’Donnell, JJ., concur in the foregoing opinion.