Praxedis **TREVINO**, Mark Arredondo, Adelino Torres, Individually and on behalf of all others similarly situated; and Joe Ochoa, Olga Cornejo, Individually and in their capacity as precinct committeemen or vice-committeemen, Plaintiffs,

v.

Robert **PASTRICK**, a Chairman of the Lake County Democratic Central Committee; Rudy Bartolomei, Frank Stodola, and N. Atterson Spahn, as Lake County Board of Commissioners; Don Cox, John Livingood, and Susan Davis, as the Indiana State Election Board; and Michael Pannos, Joseph Kotso, Kenneth Petterson, and John Holland, as the Lake County Election Board; and Edward Lukawski, in his capacity as Secretary to the Lake County Election Board, Defendants.

No. H 83–230.

United States District Court, N.D. Indiana, Hammond Division.

May 20, 1983.

Raymond G. Romero, Mexican American Legal Defense & Educational Fund, Chicago, Ill., Paul Giorgi, Merrillville, Ind., for plaintiffs.

Anthony DeBonis, Jr., Murphy, McAtee, Murphy & Costanza, East Chicago, Ind., Gonzalo P. Curiel, James & James, Dyer, Ind., for defendant Pastrick.

Edward H. Feldman, Asst. Lake County Atty., Crown Point, Ind., for defendants Bartolomei, Stodola, Spahn, Pannos, Kotso, Petterson, Holland, and Lukawski.

Linley E. Pearson, Atty. Gen., Indianapolis, Ind., for defendants Cox, Livingood, and Davis.

## ORDER DENYING MOTION TO RECONSIDER

KANNE, District Judge.

At the conclusion of the hearing on the motion for preliminary injunction, the court indicated that there was a lack of evidence to support plaintiffs' allegations under the Voting Rights Act, 42 U.S.C. § 1973 et seq.; the Civil Rights Act, 42 U.S.C. §§ 1983 and 1985; and the one person/one vote provision of the Fourteenth Amendment.[1]

The court further indicated that it found there would be no irreparable harm to the plaintiffs if the primary election for the City of East Chicago proceeded as scheduled on May 3, 1983.

On May 5, 1983, the plaintiffs filed a motion to reconsider and memorandum in support thereof. Only two of the various issues raised in the motion need be addressed by the court: 1) that precinct committeemen are public officials because they serve as deputy registrars and 2) that the precincts vary greatly in population.

■ In its comments from the bench on April 21, 1983, the court noted that precinct committeemen are officials of a political party and not governmental officials.[2] The court went on to say that "only when precinct committeemen participate in a caucus under Indiana state law I.C. 3–1–2–2 to select a person to fill a vacancy in a governmental office do precinct committeemen arguably perform a constitutionally protected function of [the] electorate." *See: Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Seergy v. Kings County Republican County Committee,* 459 F.2d 308 (2nd Cir.1972). *But see: Sailors v. Board of Education of County of Kent,* 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967).

As Justice Rehnquist stated in *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978):

[O]ur cases make it clear that the conduct of the elections [of public officials] is an exclusively public function. This principle was established by a series of cases challenging the exclusion of blacks from participation in primary elections in Texas. Although the rationale of these cases may be subject to some dispute, their scope is carefully defined. The doctrine does not reach to all forms of private political activity, but encompasses only state regulated elections or elections conducted by organizations which in practice produce the uncontested choice of public officials (citations and footnote omitted).

■ To reiterate, a precinct committeeman in Indiana is an official of a political party. He may, along with other persons not precinct committeemen, take on the incidental role of a deputy registrar, and by

---

[1]. With regard to the principle of one person/one vote, in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court recognized that districts of unequal population can violate a voter's right to equal protection of the laws guaranteed by the Fourteenth Amendment.

[2]. While Democratic precinct committeemen in the City of East Chicago may be able to arrange improved garbage pickup or expedite street repairs, they are not, thereby, converted into public officials.

doing so temporarily become a public official when acting in that capacity.[3] A precinct committeeman's "ex officio" status as a deputy registrar does not mean that he stands for election in his precinct as a public official. He is elected only by the members of his own party and not the general electorate.

It is the position of deputy registrar that is a public office, and many persons other than precinct committeemen serve as deputy registrars. I.C. 3–1–7–6. However, only precinct committeemen can participate in a caucus election to fill a vacancy in a public office. I.C. 3–1–2–2.

The selection and conduct of *deputy registrars*, regardless of whether they are precinct committeemen or not, may become significant either under the Fourteenth Amendment or the Civil Rights Act. The selection and conduct of *caucus members* acting in caucus election may become significant either under the Fourteenth Amendment or the Civil Rights Act. However, unlike deputy registrars, caucus members are synonymous with precinct committeemen.[4]

■ Here it is important to point out that the thrust of plaintiffs' claim was essentially two-fold. First, that several thousand Hispanic voters were being denied the right to register, and second, that the reorganization of precincts resulted in the reduction of precinct committeemen of Hispanic descent and thereby adversely affected the rights of Hispanic citizens to exercise their franchise.

To support these contentions the plaintiffs offered no evidence that any Hispanic citizen was denied the right to register. The evidence further discloses that no action by any defendant limited or reduced the participation of Hispanic precinct committeemen serving as deputy registrars for the May 3, 1983 primary election. As the court has previously stated the evidence shows there was a very sizeable number of Hispanic deputy registrars, including those who were precinct committeemen prior to the realignment of precinct boundaries.[5] The primary election which plaintiffs sought to enjoin was preceded by a registration period which closed prior to appointment of successor precinct committeemen. All registration of voters was subject to being carried out by persons entitled to serve as deputy registrars under the former precinct alignment. Thus, the realignment of precinct boundaries had absolutely no affect on the number of Hispanic deputy registrars for the May 1983 primary election.[6]

Significantly, the May 1983 primary election did not include election of persons on the basis of location within a precinct such as precinct committeemen.

Plaintiffs' contentions that precinct committeemen select the precinct election board and the site for the polling place and therefore assume the role of public officials is plainly contrary to Indiana law and the weight of the evidence. I.C. 3–1–5–1 provides "[T]he county election board shall appoint for each voting precinct in its county the precinct boards of election, each of which shall consist of one inspector, and two judges of opposite political faith who shall be qualified voters of the county in which said precinct is situated." Further, I.C. 3–1–5–2 provides that "Such county election board shall appoint for each precinct in the county two clerks of opposite

---

**3.** *See: Ulrich v. Beatty,* 139 Ind.App. 174, 216 N.E.2d 737 (1966).

**4.** Where practice or procedures involving deputy registrars or caucus members adversely affect voting rights, Section 2(a) of the Voting Rights Act may also apply. However, Indiana political parties and their officials are not covered by Section 5 of the Voting Rights Act.

**5.** Under Indiana law precinct committeemen constitute only a portion of the total number of deputy registrars. I.C. 3–1–7–6. In addition to the precinct committeemen of Hispanic origin, other Hispanic deputy registrars were appointed by the voter registration board.

**6.** Whether or not the realignment of precinct boundaries will have an adverse effect on Hispanic voters in any subsequent election was not the issue presented by the motion for preliminary injunction.

political faith, who are qualified voters in the county and, in the event it is found necessary, two assistant clerks of opposite political faith who shall have the same qualifications." And finally I.C. 3–1–5–8 provides "such county election board shall appoint for each precinct in the county two election sheriffs of opposite political faith, who shall be qualified voters of the county ...." It is clear from each of the foregoing statutes that the officers named need not be residents of precincts for which they are selected.

I.C. 3–1–5–11 provides, in effect, that the county chairman of the Republican and Democratic parties have the right to nominate voters for precinct election offices and the county election board shall appoint the voters so nominated. The evidence discloses that while the county chairman may accept recommendations of the precinct committeemen, it is the sole prerogative of the county chairman to make the nominations for appointment by the county election board.

As to the selection of the site for polling places contrary to plaintiffs' allegations, this matter is left exclusively to the county commissioners under I.C. 3–1–23–17. Again, while a precinct committeeman may recommend a location, the duty for selection of polling places lies with an arm of county government.

In summary, there existed no irreparable or immediate harm. No evidence was produced that any Hispanic citizen was denied the right to register to vote; no evidence was produced that Hispanics who were precinct committeemen prior to the realignment of precinct boundaries were denied the right to act as deputy registrars; and no credible evidence was produced to show that the realignment of precinct boundaries would have any impact whatsoever on Hispanic participation in the 1983 primary election in East Chicago, Indiana.

Furthermore, plaintiffs correctly pointed out that the 1982 precinct alignments resulted in a general disparity of population between precincts.[7] Yet, during the statutory reorganization process, plaintiffs did not complain or bring action seeking to achieve equitable adjustment of precinct populations; but rather they later sought, through this action, a return to the original 1971 precinct alignment. However, the evidence is particularly clear that the original 1971 precincts had become generally more disparate than those established in 1982.

For the court to order, as plaintiffs requested, a return to the original 1971 precincts would not have corrected the underlying problem of disparity of population between precincts.

Therefore, in view of all the foregoing, there was no reasonable likelihood of plaintiffs succeeding on the merits as they relate to the 1983 primary election in East Chicago, Indiana.

On the basis of the foregoing findings defendants' motion to reconsider, filed pursuant to Rule 59 of the Federal Rules of Civil Procedure, is hereby OVERRULED and DENIED.

---

7. By contrast, however, the realigned councilmanic districts appear to be within acceptable deviation limits and constitute a significant improvement over the 1971 boundaries.