851 So.2d 974 (2003)
Frank Baist ALLAIN, et al.
v.
MARTCO PARTNERSHIP.
No. 2002-CA-1796.
Supreme Court of Louisiana.
May 23, 2003.
Rehearing Denied September 5, 2003.
*976 Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, James Patrick Dore, Alan J. Berteau, Amy Louise deGeneres Berret, Baton Rouge, Counsel for Appellant.
Dupont, Dupont & Dupont, James H. Dupont, William Christopher Dupont, Plaquemine, Counsel for Appellee.
Christopher J. Dicharry, Baton Rouge, Marion A. French, Alexandria, Counsel for Amicus Curiae.
JOHNSON, Justice.
This matter arises out of the sale of timber where the minority co-owners filed suit against the buyer to annul the sale. After a trial, the trial court ruled in favor of the buyer and against the minority, who appealed. The court of appeal reversed *977 the trial court's ruling and found that LSA-R.S. 3:4278.2 was unconstitutional. This Court docketed the case as an appeal to determine whether the statute is unconstitutional.

FACTS & PROCEDURAL HISTORY
The ownership interest of 9,617 acres of timberland located in Iberville and West Baton Rouge Parishes was divided, for the purpose of this matter, into two groups the majority co-owners, owning 82.5% interest, and the minority co-owners, owning 17.5% interest. On December 30, 1993, the majority co-owners and Martco Partnership ("Martco") entered into a contract to sell the timber. However, the minority co-owners ("minority") refused to participate in the sale.[1] The timber was sold and the minority's portion of the sale proceeds was deposited into the registry of the court. On March 30, 1994, the minority filed suit against Martco to annul the timber sale, arguing that: 1) the consideration for the sale was so inadequate that it constituted lesion beyond moiety; 2) Martco failed to strictly comply with the provisions set forth in LSA-R.S. 3:4278.2;[2] and 3) LSA-R.S. 3:4278.2 is unconstitutional. After a bench trial, the trial court rejected each of the minority's claims and ruled in favor of Martco. Specifically, the trial court found that:
... LSA-R.S. 3:4278.2, bears a rational relationship to the legitimate state interest of the conservation and use of forest resources in the State of Louisiana and, is therefore constitutional.
The court also finds as a matter of fact and based upon the evidence adduced at trial that Martco Partnership complied fully with the provisions of the applicable statute, 3:4278.2 et seq, and offered each co-owner the exact terms and conditions, including the offer required to be made to the non-consenting landowners.

*978 The court further finds as a matter of fact and based upon the evidence adduced at trial that the price paid for the timber purchased was in excess of 50% of the value of said timber and the sale of said timber is therefore not lesionary.
The minority appealed the trial court's ruling. The court of appeal reversed the trial court's ruling. Allain v. Martco Partnership, 01-0614 (La.App. 1st Cir.4/17/02), 828 So.2d 587.
The court of appeal held that: 1) the trial court reasonably found that the price Martco paid the minority for the timber was not lesionary; 2) the minority was not entitled to damages for the loss of aesthetic value, reforestation cost, or mental anguish; and 3) minority would be adequately compensated with $218,295.20 in damages, for their loss of right to determine the conditions and timing of the timber sale. The court of appeal found no manifest error in the trial court's decision that Martco's price paid was not less than 50% of the fair market value and thus was not lesionary. The court of appeal noted that the trial court has great discretion in assessing the credibility of expert witnesses and accepting or rejecting their opinions.[3] The trial court, after viewing the timber and hearing the testimony of four foresters, who cruised[4] the timber, determined that the price paid by Martco exceeded 50% of the fair market value and ruled that the price was not lesionary.
Next, the court of appeal held that Martco complied with the statute regarding the sale of co-owned timber by offering the minority a contract on "substantially the same basis" as the majority owners. The court of appeal noted that the differences in the contracts, i.e., the legal description of the tract of land; the method of payments (the two split payments made to the majority versus the lump sum paid to the minority owners) were inconsequential since the price, terms, and conditions were the same.
The court of appeal, in finding that LSA-R.S. 3:4278.2 was unconstitutional, held that the statute impermissibly allowed a "`quick-taking' of privately-owned property by private parties for private purposes, with no prior notice or opportunity" to be heard. The court of appeal reasoned that under the statute, minority owners would not receive notice until the sale had been confected by a purchase agreement. Therefore, minority owners, under the statute had no opportunity to participate in negotiations regarding the timber and its value.
Finally, the court of appeal held that the statute was unconstitutional because it violated the minority's right to procedural due process.[5] The court of appeal found that the trial court failed to address the statute's compliance with procedural and substantive due process.
This Court docketed the case as an appeal to determine whether LSA-R.S. 3:4278.2 is unconstitutional. Allain v. Martco Partnership, 02-1796 (La.10/4/02), 826 So.2d 1132. The minority did not seek supervisory review of the ruling by the court of appeal, nor did they answer Martco's appeal; therefore, the only issues before this Court are those raised by Martco. *979 Martco argues that: LSA-R.S. 3:4278.2 does not raise due process concerns because action by private landowners does not equate to "state action" and that even if action by the majority owners can be construed as "state action," the statute meets the due process requirements and provides non-consenting co-owners an opportunity to contest the sale.

DISCUSSION
The issue is res nova before this Court as to whether LSA-R.S. 3:4278.2 is unconstitutional, thereby violating the Fourteenth Amendment of the United States Constitution and LSA-Const., Article I, Sections 2 and 4.[6]
In considering the constitutionality of a statute, jurisprudence recognizes the general presumption of a statute's constitutionality. Brown v. State, Department of Public Safety & Corrections, 96-2204 (La.10/15/96); 680 So.2d 1179. The party that challenges the statute's constitutionality carries the burden of proving by clear and convincing evidence specific constitutional infirmities. Id.
In Board of Commissioners of Orleans Levee District v. Dept. of Natural Resources, 496 So.2d 281, 296 (1986), this Court found that:
Unlike the federal constitution, [our] state constitution's provisions are not grants of power but instead are limitations on the otherwise plenary power of the people of a state exercised through its legislature. In its exercise of the entire legislative power of the state, the legislature may enact any legislation that the state constitution does not prohibit. Thus, to hold legislation invalid under the constitution, it is necessary to rely on some particular constitutional provision that limits the power of the legislature to enact such a statute.
In order to challenge the statute's constitutionality, the plaintiffs must indicate a specific provision of the Louisiana Constitution which would directly prohibit the enactment of LSA-R.S. 3:4278.2. In Polk v. Edwards, 626 So.2d 1128 (La.1993), this Court held that if there is any doubt as to the constitutionality of a statute, the issue must be resolved in favor of its constitutionality unless the opponent clearly establishes that the constitutional aim was to deny the legislature the power to enact such a statute.
The United States Constitution Fourteenth Amendment and the Louisiana Constitution Article I, Section 2, the Due Process Clause, guarantee freedom from the deprivation of life, liberty or property without due process of law. The fundamental requirement of procedural due process is notice and the opportunity to be heard at a meaningful time and in a meaningful manner. LSA-Const. Art. I, Sec. 2. In City of New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), the United States Supreme Court found the Due Process Clause protects from arbitrary and unreasonable actions and the judiciary is prohibited from acting as a "superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." In Ferguson v. Skrupa, 372 U.S. 726, 730-31, 83 S.Ct. 1028, 1031, 10 *980 L.Ed.2d 93 (1963), the Court found that a state is permitted to enact laws, which would not run afoul of federal constitutional prohibitions, to protect against injurious practices in its internal commercial and business affairs.
The United States Constitution Fourteenth Amendment and the Louisiana Constitution Article I, Section 2 and 4 serve as a reasonable restriction on the exercise of the State's police power. New Orleans Public Service Co., v. City of New Orleans, 168 La. 984, 123 So. 648 (La. 1929), aff'd, 281 U.S. 682, 50 S.Ct. 449, 74 L.Ed. 1115 (1930); Ransome v. Police Jury Parish of Jefferson, 216 La. 994, 45 So.2d 601 (1950). In City of Shreveport v. Curry, 357 So.2d 1078 (La.1978), this Court defined "police power" as the power of a governmental body that reasonably regulate the citizens' actions in order to protect or promote public health, safety, morals, peace or general welfare.
We now turn our attention to the statute in question. Our review of the legislative history of LSA-R.S. 3:4278.2 shows that when it was first introduced as House Bill No. 1039 (1992), it was presented to authorize the sale of an undivided interest of timber with the consent of eighty percent (80%) of ownership interest in the land.[7] Representative Dewitt explained that this bill would protect the profits of the remaining twenty percent (20%) co-owners not participating in the sale by placing their profits into an escrow account. Louisiana Forestry Association Director, Buck Vandersteen, addressed both the House and Senate Agriculture Committees in support of the bill and explained the quandary attached to securing all the signatures of property owners of an undivided interest of timberland on a timber sale agreement. He emphasized that this bill permitted 80% co-owners to enter into a sale agreement while protecting the remaining 20%, who share equally in the proceeds of the sale and whose monies are placed in an escrow account. He explained that the bill's purpose was to manage forest resources and not penalize 80% when 20% could not be located or for some reason refused to cut any timber. The legislature determined that timber is a renewable resource, and proper harvesting of timber and good land management would benefit our economy and wildlife habitat.
According to the Louisiana Forestry Association, timberland, of which forty-four percent was privately owned at that time, has a substantial impact on the Louisiana economy, i.e., in 1992, approximately 10,000 people were employed in logging, 25,000 employed in wood processing plants, and every dollar ($1.00) of stumpage value harvested expanded to eight dollars ($8.00) in earnings. Thus, the State of Louisiana clearly has an interest in promoting the timber industry since the economy would greatly benefit by allowing the majority co-owners to sell their timber over the opposition of a few minority co-owners, who may contest the sale for unreasonable reasons. It would be unreasonable and against public policy to prevent the majority co-owners from selling the timber for marketing when it was ripe for harvest or to cause an unreasonable risk of substantial property loss to the majority because the minority withheld consent.
In reviewing procedural due process, the court must determine whether an aggrieved party's fundamentally protected right, such as a liberty or property rights has been violated. In re Carline Tank Servs., Inc., 627 So.2d 669 (La.App. 1st Cir.1993). In the case sub judice, the minority's claims involve their ownership *981 rights of immovable property, which are protected by procedural due process. In Price v. U-Haul Co., 98-1959, p. (La.9/8/99), 745 So.2d 593, 594, this Court held that when asserting any due process challenges, the claimant must show that a state action adversely affects one's property or liberty interest. Price also held that the test in determining the existence of state action, "when the asserted involvement is a legislative act, is whether the act codified or extended previous rights." Id. at 599. This Court noted that:
... In determining the existence of state action, Louisiana courts have routinely turned to federal cases.
Historically, the federal jurisprudence generally subdivided the determination of state action into basic categories of analysis: (1) public function concept and (2) nexus concept. Under the public function concept, state action was present when a private party engaged in certain governmental functions which were "state-like" enough to implicate the constitutional guarantees. Under the nexus concept, the state action determination turned on the relationship between the state and the activities of the alleged private wrongdoer. A subcategory of the nexus test was the state encouragement theory, under which the private party was said to have been encouraged by the state. John E. Nowak, et al., Constitutional Law 502-513 (2d. ed.1983). The nexus concept was a fluid one for which the courts declined to articulate a formal test, often stating that "[o]nly by sifting facts and weighing circumstances can the non-obvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).
In this case, Martco asserts that LSA-R.S. 3:4278.2 does not raise a due process issue because it does not involve the "state action" needed to implicate procedural due process. Martco notes that neither the Due Process Clause in the United States Constitution nor the Louisiana Constitution provide a cause of action against private actors. In contrast, the court of appeal found that state action existed because the statute did not "codify or extend previous rights," but instead authorized a "quick-taking" of "privately-owned immovable property by private parties for private purposes, with no prior notice and no opportunity for a meaningful hearing;" thus, establishing an "unprecedented mechanism whereby privately owned immovable property can be transferred without consent of the owner."
In Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), the United States Supreme Court held that when a party alleges a deprivation of due process by a state actor, he must demonstrate that the actor "acted under color of the challenged statute" and that the private action is "properly attributable" to the state. The Supreme Court noted that "our cases state that `a State is responsible for the ... act of a private party when the State, by its law, has compelled the act.' This Court, however, has never held that a State's mere acquiescence in a private action converts that action into that of the State." The Supreme Court also noted that "private use of state-sanctioned private remedies or procedures does not rise to the level of state action." Tulsa Professional Collection Servs., Inc. v. Pope, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988). In American Manufacturers Mutual Ins. Co. v. Sullivan, 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999), private insurers withheld payments for medical treatment which the state workers' compensation law authorized, and the United States Supreme Court held this was not "state action" under the Fourteenth Amendment. *982 The Court defined "state action" as: 1) the exercise of a right or privilege created by the state, or by a rule of conduct imposed by the state, or by a person for whom the state is responsible that deprives one of its constitutional right; and 2) the party charged with the deprivation must be a "state actor." The Court noted that a private entity acting pursuant to a state statute does not thereby become a state actor. The Court also noted that "private insurers ... will not be held to constitutional standards unless `there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the latter may be fairly treated as that of the State itself.' ... Whether such a `close nexus' exists ... depends on whether the State `has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" Id.; Flagg Bros., supra.
Here, Martco argues and we agree that it is not a "state actor," and LSA-R.S. 3:4278.2 neither encouraged nor compelled the private actions authorized. Martco notes that Louisiana did not benefit from the private action permitted by the statute, except to the extent that all state residents benefit from a statute that promotes economic activity. Martco also notes that the statute only clarifies a pre-existing restrictive condition on ownership rights of co-owners in indivision. Martco analogizes this statute to similar statutes which acknowledge as valid the acts of less than all co-owners. Martco submits the following examples: 1) LSA-C.C. art. 2807 allows a majority of partners to make decisions that would affect the partnership; 2) LSA-C.C. art. 2346 allows a spouse to act alone in managing, controlling, or disposing of the community property; 3) LSA-R.S. 9:1122.19, 9:1123.105, 9:1131.20(G) applies the majority rule in condominium and time-sharing regimes; 4) LSA-C.C. art. 780 allows a majority of landowners to alter or remove subdivision restrictions, which will affect all landowners; and 5) LSA-R.S. 31:164 allows 80% of co-owners to agree to subject land to mineral development.[8] Martco contends that if the State police power requires only 10% interest to transfer the mineral rights, than the 80% requirement in the case at bar clearly passes due process muster.
The minority notes that prior to the enactment of this statute, timber could not be sold without the written consent of all owners and the timber industry flourished. Thus, the minority argues that the legislature *983 was not compelled to enact this statute since it conflicts with "the free enterprise system enjoyed between buyers and sellers of timber." The minority submits that by enacting this statute, "the state created a new mechanism to transfer property to a stranger without any of the traditional safeguards normally associated with a seizure and sale of property." The minority also notes that Martco could not have purchased the timber without this statute.
Prior to the enactment of LSA-R.S. 3:4278.2, Louisiana had long recognized in LSA-C.C. art. 802 that a co-owner in indivision is entitled to use the thing without preventing another co-owner from using it, and, as against third persons, the co-owner has the right to use and enjoy the thing as if he were the sole owner.[9] Pursuant to the terms of LSA-R.S. 3:4278.2 as enacted in Act 1039, a timber buyer may remove said timber when: 1) the co-owners, owning at least eighty percent (80%) interest in the land, have consented to the sale; 2) the buyer has made a reasonable effort to contact the non-consenting co-owners; and 3) the buyer has offered to contract with them on substantially the same basis that he has contracted with the majority co-owners.
After careful consideration, we find that there is no state action implicated by LSA-R.S. 3:4278.2. As state action is a necessary component of a procedural due process claim, the minority's claim that this statute is unconstitutional must fail under the relevant analysis. Even though this Court finds no state action exists, we now alternatively discuss the fundamental requirements of procedural due process, which are notice and the opportunity to be heard. In the case sub judice, the record clearly establishes that the minority co-owners had actual notice of the proposed sale; thus, none of the minority co-owners were without notice of the sale of the timber or the opportunity to change any terms of the buyer-seller agreement. On November 23, 1993, Martco offered to purchase the timber rights from all the owners, including the minority, by sending them an "Agreement to Buy and Sell Timber" dated October 6, 1993, with the proposed timber deed attached thereto. The record indicates that this offer to the minority was not only on "substantially the same basis," but was exactly the same offer made to the majority co-owners. On December 10, 1993, the minority's representative sent a letter to Martco declining that offer. On December 30, 1993, Martco sent a revised timber deed to all the owners.[10] Because the minority refused to accept the contract, Martco modified the contract to conform to LSA-R.S. 3:4278.2. On February 4, 1994, Martco made another attempt to satisfy the minority by mailing a certified letter,[11] offering to purchase the timber and attached thereto was the "exact terms, conditions, price of the agreement, check for the proceeds, and the timber deed." The minority still refused the offer.
*984 Based on this record, this Court nonetheless concludes that LSA-R.S. 3:4378.2 provides adequate notice to minority co-owners and gives them ample opportunity to partake in the sale. Accordingly, we find that the LSA-R.S. 3:4278.2 is constitutional and does not implicate the minority's procedural due process rights.
We note that LSA-R.S. 3:4278.2 does not grant to either the state or any prospective timber purchaser the authority to unilaterally fix and enforce an arbitrary sales price. However, the final say rests with the landowners. This statute provides the minority with the following benefits: 1) his pro-rata share of the proceeds of the sale price the consenting co-owners agreed upon; 2) no liability for "the cost of timber operations resulting from the sale of the timber;" and 3) indemnity from the consenting co-owners for any damages incurred. The minority has several remedies afforded them, such as filing an injunction, requesting a partition of property, or alleging lesion and/or damages.
Turning to the issue of damages, the court of appeal awarded the minority $218,295.20, plus legal interest from the date of judicial demand, for loss of the "right to determine the timing and conditions of the sale of their timber." Martco argues that the minority is not entitled to any damages at all because, as the court of appeal concluded, Martco complied with the provisions of the statute. The minority had the opportunity to negotiate some of the terms of the sale, i.e., a higher price, the right to be paid over two tax years, and the sale of timber in smaller groups rather than all 18 tracts at once, but they chose not to do so. The record shows that Larry Mitchell testified that he contacted the minority co-owners, and their representative, Joe Dupont, said that they would sign the agreement if Martco would pay him $100,000.00 to do the title work for the timber sale. Dupont also offered to sign the agreement if Martco would purchase another tract of land owned by the minority owners. However, Martco declined both offers. Thus, Dupont refused to sign the agreement. Again, Martco offered a sale under the same terms and conditions as the majority's sale, but the minority still refused. Martco argues that in the timber market, as it existed prior to the passage of the statute in question, the minority had no right to determine the "timing and conditions of sale" of their timber. The minority urges that the award of damages was inadequate since Martco failed to contact them to get their consent. The minority also urges that in addition to the damages awarded by the court of appeal, they are entitled to: 1) treble damages under LSA-R.S. 3:4278.1; 2) future loss of growth; 3) incremental growth loss for the time taken to produce more timber; 4) restoration of the surface so that land can be replanted; 5) the actual cost of replanting a hardwood forest; and 6) a sum for mental anguish for losing the timber that belonged to their family for over 100 years. We disagree. Pursuant to LSA-R.S. 3:4278.2, the record clearly supports the court of appeal and the lower court's ruling that Martco complied with the statute. The record established that Martco acted in good faith in accordance to the statute. Martco was not acting as a "tree pirate," which would warrant damages according to LSA-R.S. 3:4278.1(C); hence, the minority is not entitled to any damages against Martco.

CONCLUSION
For the foregoing reasons, the decision of the court of appeal regarding the unconstitutionality of article LSA-R.S. 3:4278.2 and damages awarded to the minority co-owners is hereby reversed.
*985 DECREE
REVERSED.
VICTORY, J., concurs in the result.
NOTES
[1] Martco asserts that it contacted the minority and offered to purchase their timber rights on identical terms as the majority.
[2] LSA-R.S. 3:4278.2, as enacted in 1992, provides that:

A. A co-owner or co-heir of land may execute an act of timber sale whereby he sells his undivided interest in the timber, and any condition imposing a time period within which to remove the timber shall commence from the date of its execution.
B. A buyer who purchases the timber from a co-owner or co-heir of land may not remove the timber without the consent of the co-owners or co-heirs representing at least eighty percent of the ownership interest in the land, provided that he has made reasonable effort to contact the co-owners or co-heirs who have not consented and, if contacted, has offered to contract with them on substantially the same basis that he has contracted with the other co-owners or co-heirs.
C. A co-owner or co-heir of the land who does not consent to the exercise of such rights has no liability for the cost of timber operations resulting from the sale of the timber, and shall receive from the buyer the same price which the buyer paid to the other co-owners or co-heirs. The consenting co-owners or co-heirs shall agree to indemnify and hold harmless the nonconsenting co-owners or co-heirs for any damage or injury claims which may result from such operations.
D. If the nonconsenting co-owner or co-heir fails or refuses to claim his portion of the sale price of the timber, the buyer shall be obligated to hold such funds in escrow, for and on behalf of such nonconsenting co-owner or co-heir and any interest or other income earned by such funds in escrow shall inure to the benefit of the co-owner or co-heir for whom they are held.
E. Failure to comply with the provisions of this Section shall constitute prima facie evidence of the intent to commit theft of the timber by such buyer.
Subsection F, relating to the sale of timber that constitutes community property, was added by Acts 2001, No. 558 section 2, and is therefore inapplicable to the case at hand.
[3] See Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989).
[4] The court of appeal noted that timber cruising is not an exact science, but generally to cruise is to sample the tract of timber to determine the species and grade of the property's timber and to assign a market value.
[5] The court of appeal declined to address whether the statute passed constitutional muster as to substantive due process. Thus, we also decline to discuss substantive due process.
[6] In Brinker v. Junction City Wood Co., 96-2896 (La.1/20/99), 728 So.2d 1252, where co-owners of land sold their undivided interest in the standing timber to the wood company, which sought to cut the timber without the remaining co-owner's consent, the non-consenting co-owners filed a petition for an injunction and a declaratory judgment seeking to have LSA-R.S. 3:4278.2 declared unconstitutional. The trial court held that the statute was unconstitutional. This Court held that the determination of unconstitutionality was premature since the wood company had not complied with the requirements of the statute.
[7] On May 1, 1992, at the regular session, Representative Dewitt presented this bill.
[8] Martco argues that the statute in question is analogous to the mineral statutes, LSA-R.S. 3:166, which allows co-owners of at least eighty percent (80%) of mineral interests to lease the entirety of those interests without unanimous consent of all co-owners, and LSA-R.S. 30:181-188, which permits the State Mineral Board to authorize a mineral lease upon application of at least 10% or more co-owners of a mineral interest. In Sun Oil Company v. State Mineral Board, 231 La. 689, 92 So.2d 583 (1956), appeal dismissed, 354 U.S. 943, 77 S.Ct. 1395, 1 L.Ed.2d 1541 (1957), the Court noted that "the state's police powers justify measures for the regulation of production with oil and gas for the conservation of these valuable deposits." The Court held that the abovementioned mineral statutes, were not violative of either the federal or state constitutional provisions, and stated that:

[t]he only function of Act 513 of 1952 (LSA-R.S. 30:181, et seq.) is to provide a method for recovery of minerals in situations where, due to the large number of owners in indivision, exploration and production would otherwise be a practical impossibility. Such a measure designed to benefit the state and all the co-owners, is clearly a valid exercise of the police power, much the same as in an order of the Commissioner of Conservation establishing compulsory drilling units, and private rights succumb thereto.
Sun Oil Company, 92 So.2d at 588.
[9] Although LSA-C.C. art. 802 is a new provision, it expresses principles inherent in the 1870 Civil Code. In the New Law of Co-ownership, 68 Tul. L.Rev. 69, 84, the author indicates that "a co-owner `may freely lease, alienate, or encumber his share' and may, with some exceptions, demand partition of the thing so as to enjoy his share fully and exclusively.... However, although his right to use his share is direct and immediate, it is not exclusive."
[10] The record demonstrates that the revised contract did not contain a small tract of land that was originally considered in the original contract. However, the revised contract was offered to all owners of the timber. The minority refused to consent to this contract.
[11] The record indicates that each designated addressee signed the return receipt.