# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**03-1455**

**TED NORRIS, ET AL.**

**VERSUS**

**STAFFORD P. FONTENOT, ET AL.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 98-C-2200-D
HONORABLE DONALD W. HEBERT, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**MARC T. AMY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Marc T. Amy, and Elizabeth A. Pickett, Judges.

**AFFIRMED.**

**Angelo J. Piazza, III**
**Post Office Box 429**
**Marksville, LA 71351**
**(318) 253-6423**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Ted Norris**

**M. Terrance Hoychick**
**Young, Hoyhick & Aguillard (LLP)**
**Post Office Drawer 391**
**Eunice, LA 70535-0391**
**(337) 457-9331**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Stafford P. Fontenot**
    **Prairie Cajun Seafood Catering of Louisiana**

AMY, Judge.

The plaintiff filed suit to recover amounts due under two promissory notes executed by the defendant. In his answer, the defendant claimed that when he signed the promissory notes, he was acting as a representative of a partnership to which he belonged, and, as such, he was only liable for his virile share of the debt. The trial judge determined that a partnership existed when the promissory notes were executed and that they were executed on its behalf. Accordingly, judgment was entered against the partnership for the amounts due on the notes. The plaintiff appeals, asserting that the defendant is personally liable for the entire amount due on the promissory notes. For the following reasons, we affirm.

### Factual and Procedural Background

Ted Norris, plaintiff herein, designed and built a "mobile kitchen" for use at festivals by installing cooking equipment, such as stoves, burners, and coolers, in an empty eighteen-wheeler trailer. Mr. Norris estimated the value of the completed kitchen to be $50,000.

Stafford Fontenot, defendant herein, testified at trial that, approximately six or seven months before the 1996 Summer Olympics, he and some friends—Steve Turner, Mike Montelaro, Joe Sokol, and Doug Brinsmade—discussed going to Atlanta, Georgia, the site of the Games, to sell seafood and other Cajun dishes. However, they did not have the cooking equipment needed for the endeavor. Mr. Fontenot testified that Mr. Turner and Mr. Montelaro learned of Mr. Norris's "mobile kitchen" and entered into preliminary negotiations with him for its purchase.

The act of sale was executed on June 12, 1996, at the office of William Bennett, Mr. Norris's attorney. The record reflects that at this time, Mr. Brinsmade gave Mr. Norris a down payment of $8,000, in the form of a check drawn on an account titled,

"Prairie Cajun Seafood Catering of LA." Mr. Bennett then presented Mr. Fontenot with two promissory notes representing the balance of the purchase price of the kitchen: one for $12,000, and the other for $20,000.

Mr. Fontenot testified that upon examining the notes, he noticed that his was the only name listed as maker, and he informed Mr. Bennett that he would not sign individually. According to his testimony, Mr. Bennett replied that he and Mr. Norris did not intend to list Mr. Fontenot's associates as co-obligors. At trial, Mr. Fontenot claimed that he made it clear to Mr. Bennett that the group was purchasing the kitchen. He recalled that Mr. Bennett offered to re-write the notes, telling him that the addition of "d/b/a Prairie Cajun Seafood" after his name would "kind of take care of it." Mr. Fontenot stated that it was his understanding that adding "d/b/a" to the notes would relieve him of personal liability as to the notes and would instead make the obligation one of the partnership. After the promissory notes were rewritten and signed, the group took possession of the kitchen.

Mr. Fontenot testified that the results of the group's catering endeavor in Atlanta were "disastrous" and that what little money they made "went back through [the group's] checking account." He stated that the group has not engaged in business since the Olympics.

Ted Norris also testified at trial as to his understanding of the events surrounding the sale of the "mobile kitchen." He stated that Mr. Fontenot and a "group of people" came to see the "mobile kitchen," but he did not know who the other people were. He likewise recalled that several gentlemen accompanied Mr. Fontenot to Mr. Bennett's office when the act of sale was passed but that Mr. Fontenot had not explained his relationship to them. Mr. Norris testified that he had assumed that the gentlemen were "associated with" Mr. Fontenot and that he "took it for

2

granted that [Mr. Fontenot] owned the company [that was going to use the kitchen]." Mr. Norris recalled that his attorney had advised against selling the kitchen to a corporation or to a "group" and had assured him that the sale was "personally between [him] and Stafford Fontenot."

On June 9, 1998, Mr. Norris filed suit against Mr. Fontenot, d/b/a Prairie Cajun Seafood Catering of Louisiana, in the district court for Avoyelles Parish, the parish of his—Mr. Norris's—domicile. In his petition, he asserted that no payments had been made on either of the two promissory notes. Mr. Fontenot, a domiciliary of St. Landry Parish, filed an exception of improper venue, and, pursuant to a joint petition filed by the respective parties' attorneys, the matter was transferred to St. Landry Parish. On December 10, 1998, Mr. Norris filed a supplemental and amending petition, in which he named as defendants Mr. Brinsmade, Mr. Montelaro, and Mr. Turner, noting that they were "principals in the business Prairie Cajun Seafood Catering of Louisiana." However, Mr. Norris voluntarily dismissed Messrs. Brinsmade, Montelaro, and Turner in open court on May 7, 2001, and on May 29, 2002, in a second supplemental and amending petition, he requested that references to these gentlemen be "delete[d]" from his petition. On May 24, 2002, Mr. Fontenot filed an exception of failure to join an indispensable party—*viz.*, the partnership, Prairie Cajun Seafood Catering of Louisiana.

The matter proceeded to trial on May 29, 2002. On July 10, 2002, the trial judge issued written reasons for judgment, which stated, in pertinent part, as follows:

> Plaintiff, Ted Norris, testified that it was his impression that Stafford Fontenot was buying the mobile trailer himself. He testified that he didn't ask Stafford Fontenot about his business partners.
> The eight thousand dollar ($8000.00) check dated June 11th, 1996 was signed by Doug Brinsmade, from Prairie Cajun Seafood Catering of Louisiana.
> Mr. Norris indicated that he did business with Stafford Fontenot.

3

Della Norris, wife of Plaintiff, testified that they were dealing with Stafford Fontenot and that Mr. Fontenot never indicated to them that he had partners with him in the business.

Defendant, Stafford Fontenot, testified that his business partners, namely; [sic] Steve Turner and Mike Montelaro were introduced to the Plaintiffs as business partners.

Mr. Stafford Fontenot indicated that he had refused to sign the two (2) notes individually, and they subsequently went back to now Judge William Bennett's office and added d/b/a Prairie Cajun Seafood Catering of Louisiana to the promissary [sic] notes.

Stafford Fontenot testified that Mr. Brinsmade was present at the closing.

Judge William Bennett, in his deposition taken for trial purposes on July 31st, 2001, testified that he "remembers [sic] that there were a group of guys that wanted to buy this machine. And they wanted to form a corporation or a partnership that was not yet formed. The transaction was done and it was my understanding that they were going to form a partnership, and then the partnership was going to take over the debt from Mr. Fontenot or whoever it was that was signing the note at that time". [sic]

The partnership agreement in this case marked as D-1 was signed on July 31st, 1996. The two (2) notes were dated June 12, 1996. The issue here in this case is whether there was a partnership that existed, namely; [sic] Prairie Cajun Seafood Catering of Louisiana.

In this particular case you must look at the intent of the parties.

The Court finds that a partnership existed in this case.

A checking account was established in the name of Prairie Cajun Seafood Catering of Louisiana.

A check in the sum of eight thousand dollars ($8000.00) was written from Prairie Cajun Seafood Catering of Louisiana to Della Norris, signed by Doug Brinsmade.

The two (2) notes were signed by Stafford Fontenot, d/b/a Prairie Cajun Seafood Catering of Louisiana.

Mr. Stafford Fontenot had refused to sign the notes individually.

The intent here, even though the partnership agreement was executed some six (6) weeks later, was that the partnership was going to be responsible for the payment of the two (2) notes.

ACCORDINGLY, there shall be judgment in favor of Plaintiffs and against the partnership, Prairie Cajun Seafood Catering of Louisiana in the sum of thirty-two thousand dollars plus interest and 25% attorney fees.

Mr. Norris appeals this judgment, claiming in his sole assignment of error that the trial judge incorrectly determined that Mr. Fontenot was not personally liable on the notes.

**Discussion**

4

On appeal, Mr. Norris contests the validity of the trial judge's conclusion that Mr. Fontenot, Mr. Brinsmade, Mr. Montelaro, Mr. Turner, and Mr. Sokol were partners in a business enterprise and that this partnership was liable on the promissory notes at issue herein. We now review the evidence presented at trial, in light of the requirements for the formation of a partnership outlined in the Civil Code and in the jurisprudence of this state, in order to determine whether the trial judge was correct in determining that these gentlemen had indeed formed a partnership.

Louisiana Civil Code Article 2801 provides this definition of partnership:

> A partnership is a juridical person, distinct from its partners, created by a contract between two or more persons to combine their efforts or resources in determined proportions and to collaborate at mutual risk for their common profit or commercial benefit.
> Trustees and succession representatives, in their capacities as such, and unincorporated associations may be partners.

Louisiana courts have established criteria whereby a business association may be categorized as a partnership. In determining whether a partnership has been established, courts generally employ the following three-part test:

> To be considered a partnership, a business relationship must meet the following established criteria: (1) the parties must have mutually consented to form a partnership and to participate in the profits which may accrue from property, skill, or industry, furnished to the business in determined proportions by them; (2) all parties must share in the losses as well as the profits of the venture; and (3) the property or stock of the enterprise must form a community of goods in which each party has a proprietary interest.

*Medline Indus., Inc. v. All-Med Supply & Equip.*, 94-1504, p. 5 (La.App. 1 Cir. 4/7/95), 653 So.2d 830, 833. Moreover, a partnership may be formed pursuant to an oral agreement if each of the required elements is present. *See Tabco Exploration, Inc. v. Tadlock Pipe & Equip., Inc.*, 617 So.2d 606 (La.App. 3 Cir.), *writ denied*, 625 So.2d 1057 (La.1993). With respect to a partner's liability for partnership debts, La.Civ.Code art. 2817 provides, "A partnership as principal obligor is primarily liable

5

for its debts. A partner is bound for his virile share of the debts of the partnership but may plead discussion of the assets of the partnership."

A trial court's determination as to whether a partnership exists is a matter of fact and will not be disturbed on appeal absent manifest error. *See Tabco Exploration*, 617 So.2d 606. Moreover, it is well settled that appellate courts owe great deference to factual determinations that are based upon the trial court's evaluations as to witnesses' credibility, and such determinations may not be disturbed unless they are manifestly erroneous. *Allain v. Martco Partnership*, 01-0614 (La.App. 1 Cir. 4/17/02), 828 So.2d 587, *rev'd on other grounds*, 02-1796 (La. 5/23/03), 851 So.2d 974.

The first identifying characteristic of a partnership, as expressed in *Medline Industries*, above, is that the parties involved must have consented to the formation of a partnership and must have agreed to participate in the profits derived from the partnership business and to contribute property, skill, or industry, to the partnership in agreed-upon proportions. In the instant matter, Mr. Fontenot testified that six or seven months before the 1996 Summer Olympics, he and his friends had come to an understanding that they would sell Cajun food in Atlanta together, and they had begun making preparations to this effect. The record reflects that these preparations did not contemplate that Mr. Fontenot would be the sole proprietor of the business, with the other gentlemen as his employees. In addition, the record indicates that the first instance of the group calling themselves by the name "Prairie Cajun Seafood Catering of Louisiana" was on a Special Food Services application dated May 19, 1996, that was submitted to the Fulton County Department of Public Health-Environmental Health Services. This application stated that all five gentlemen named above were partners.

Our review of the law of partnership does not indicate that members of an alleged partnership must be able to point to a specific date upon which the partnership began. Although the record reflects that the partnership agreement was not signed until July 31, 1996, it is apparent from the evidence that Mr. Fontenot and his friends had an oral agreement to form an association and to work together toward a common goal before they purchased the mobile kitchen on June 12, 1996.

The second feature of a partnership, as stated in *Medline Industries*, is that all parties involved must share in the business's profits as well as losses. In the partnership agreement dated July 31, 1996, the parties indicated that profits and losses would be allocated according to the following percentages: Stafford Fontenot, 24%; Doug Brinsmade, 19%; Joe Sokol, 19%; Mike Montelaro, 19%; and Steve Turner, 19%. Moreover, the intent of the parties to share in the profits and losses of the enterprise is demonstrated by the following exchange at trial:

> Q [by Mr. Hoychick, attorney for the defendant]. The uh, the business that y'all had put together to sell seafood and crawfish in Atlanta, how were you going to operate that as far as financing the business and then how were you going to divide profits?
> A [by Mr. Fontenot]. We had a share and then was each going to pay our share of monies as we needed it, which we did put up as we needed em. Like for the trailer and deposits and all that stuff was put up by all of us and deposited and you know kind of flowed through there.

The record reflects that the above-named gentlemen intended to share in the profits and losses of the partnership and also intended to contribute personal resources toward the accomplishment of the group's objectives.

The third characteristic of a partnership, according to *Medline Industries*, 653 So.2d at 833, is that "the property or stock of the enterprise must form a community of goods in which each party has a proprietary interest." The record indicates that Mr. Fontenot did not consider the "mobile kitchen" to be his personal property; instead,

7

he thought that it belonged to the partnership. He testified at trial that its title was still in the name of Stafford Fontenot, d/b/a Prairie Cajun Seafood Catering of Louisiana. Furthermore, the various receipts for services that were among the business records introduced into evidence at trial are all in the name of Prairie Cajun Seafood Catering. The bank account at NationsBank of Atlanta was established on May 31, 1996, in the name of "Prairie Cajun Seafood Catering of LA and Associates." None of these receipts or documents were in any one party's name. This indicates that the parties intended to do business through Prairie Cajun Seafood Catering as a separate entity, with the result that any property acquired for the business was the property of the partnership, not of any one particular party.

In support of his argument that Mr. Fontenot, *et al.*, had not formed a partnership, Mr. Norris claims that "none of the alleged partners appeared during the dealing or even at trial, nor was the partnership ever made any [sic] party to the sale or notes. None of the alleged partners appeared at trial." The record reflects that Mr. Norris was aware of Mr. Fontenot's partners because they were named defendants in the present cause of action, owing to their status as "principals" in Prairie Cajun Seafood Catering, until Mr. Norris voluntarily dismissed them from the suit. Furthermore, Mr. Fontenot testified that he and Mr. Montelaro, Mr. Brinsmade, and Mr. Turner were present when the act of sale was passed, and he introduced these gentlemen as his partners. The trial judge determined that Mr. Fontenot's testimony in this respect was credible, as it was cited in his written reasons for judgment in support of his determination that a partnership existed.

Our review of the record does not indicate that the trial judge was manifestly erroneous or clearly wrong in determining that the elements necessary for formation of a partnership were present and that the partnership, as an entity, coalesced before

8

the sale of the "mobile kitchen." The trial judge's determination to this effect, as set forth in the written reasons for judgment, was premised upon the evidence offered at trial as well as upon the testimony of witnesses. The trial judge apparently determined that Mr. Fontenot was a more credible witness than Mr. Norris; based upon our examination of the record, we do not find this determination to be manifestly erroneous.

We now address Mr. Norris's argument regarding mandate. Mr. Norris claims that the judgment of the trial court in this matter announces a "dangerous...precedent" with respect to the law of negotiable instruments. In his brief on appeal, he complains that:

> It is absolutely unconscionable and totally repugnant to our negotiable instrument laws to allow a maker to allege 'partnership or division' or 'partial payment' on a note where the maker is personally liable. This would allow a maker to urge defenses that could conceivably destroy the whole integrity of the 'holder in due course' statutes in our law.

In support of this assertion, Mr. Norris observes that, pursuant to La.R.S. 10:3-402[1], if a "maker" of a note signs in a representative capacity, he must so indicate on the note. If he does not, the holder may recover against him personally. Mr. Norris claims that the notation "d/b/a Prairie Cajun Seafood" indicates only that Mr. Fontenot was the business's sole proprietor; as such, he is liable for the entire amounts due on the notes.

Louisiana Civil Code Article 2814 provides, in pertinent part, that "[a] partner is a mandatary of the partnership for all matters in the ordinary course of its business other than the alienation, lease, or encumbrance of its immovables." Furthermore, the relevant portion of La.Civ.Code art. 2816 states that "[a]n obligation contracted for the partnership by a partner in his own name binds the partnership if the partnership

---

[1]Louisiana Revised Statutes 10:3-402 provides as follows:
(a) If a person acting, or purporting to act, as a representative signs an instrument by signing either the name of the represented person or the name of the signer, the represented person is bound by the signature to the same extent the represented person would be bound if the signature were on a simple contract. If the represented person is bound, the signature of the representative is the "authorized signature of the represented person" and the represented person is liable on the instrument, whether or not identified in the instrument.
(b) If a representative signs the name of the representative to an instrument and the signature is an authorized signature of the represented person, the following rules apply:
(1) If the form of the signature shows unambiguously that the signature is made on behalf of the represented person who is identified in the instrument, the representative is not liable on the instrument.
(2) Subject to Subsection (c), if (i) the form of the signature does not show unambiguously that the signature is made in a representative capacity or (ii) the represented person is not identified in the instrument, the representative is liable on the instrument to a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument. With respect to any other person, the representative is liable on the instrument unless the representative proves that the original parties did not intend the representative to be liable on the instrument.
(c) If a representative signs the name of the representative as drawer of a check without indication of the representative status and the check is payable from an account of the represented person who is identified on the check, the signer is not liable on the check if the signature is an authorized signature of the represented person.

benefits by the transaction or the transaction involves matters in the ordinary course of its business."

The premise of Mr. Norris's argument on appeal is that he is a holder in due course of a negotiable instrument, as defined in La.R.S. 10:3-302[2]. He points out that Mr. Fontenot does not contest the signature on the notes as his; moreover, he does not

---

[2]Louisiana Revised Statutes 10:3-302 provides as follows:

(a) Subject to Subsection (c) and R.S. 10:3-106(d), "holder in due course" means the holder of an instrument if:

(1) the instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

(2) the holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in R.S. 10:3-306, and (vi) without notice that any party has a defense or claim in recoupment described in R.S. 10:3-305(a).

(b) Notice of discharge of a party, other than discharge in an insolvency proceeding, is not notice of a defense under Subsection (a), but discharge is effective against a person who became a holder in due course with notice of the discharge. Public filing or recording of a document does not of itself constitute notice of a defense, claim in recoupment, or claim to the instrument.

(c) Except to the extent a transferor or predecessor in interest has rights as a holder in due course, a person does not acquire rights of a holder in due course of an instrument taken (i) by legal process or by purchase in an execution, bankruptcy, or creditor's sale or similar proceeding, (ii) by purchase as part of a bulk transaction not in ordinary course of business of the transferor, or (iii) as the successor in interest to an estate or other organization.

(d) If, under R.S. 10:3-303(a)(1), the promise of performance that is the consideration for an instrument has been partially performed, the holder may assert rights as a holder in due course of the instrument only to the fraction of the amount payable under the instrument equal to the value of the partial performance divided by the value of the promised performance.

(e) If (i) the person entitled to enforce an instrument has only a security interest in the instrument and (ii) the person obliged to pay the instrument has a defense, claim in recoupment, or claim to the instrument that may be asserted against the person who granted the security interest, the person entitled to enforce the instrument may assert rights as a holder in due course only to an amount payable under the instrument which, at the time of enforcement of the instrument, does not exceed the amount of the unpaid obligation secured.

(f) To be effective, notice must be received at a time and in a manner that gives a reasonable opportunity to act on it.

(g) This Section is subject to any law limiting status as a holder in due course in particular classes of transactions.

11

dispute the obligation and the terms that appear on the notes. Mr. Norris claims that the notes do not contain any reference to a partnership[3].

In the case *sub judice*, we find no merit in Mr. Norris's claim that the trial court's judgment poses a threat to the enforcement of negotiable instrument law. Mr. Fontenot testified that he entered into the act of sale on behalf of a partnership, and the evidence supports this assertion. Furthermore, as noted above, the Civil Code provides that partners are mandataries of the partnership in matters pertaining to its business. In the instant appeal, the trailer was essential to the group's cooking enterprise, and its purchase was within the scope of partnership business. Mr. Fontenot was acting on behalf of his partners when he signed the contract as "Stafford Fontenot, d/b/a Prairie Cajun Seafood Catering of Louisiana." No evidence was presented at trial that indicated that he operated the catering business solely in his own name; in fact, references to Prairie Cajun Seafood Catering in the record reflect its character as a partnership. This assignment is without merit.

### DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this proceeding are assigned to the plaintiff-appellant, Ted Norris.

**AFFIRMED.**

---

[3]In particular, Mr. Norris posits that "d/b/a Prairie Cajun Seafood" refers to a "longstanding personal business that Mr. Fontenot owned as sole proprietor." In support of this contention, Mr. Norris points to the cover sheet of a fax that was sent to Doug Brinsmade, preceding the transmission of the proposed menu for Prairie Cajun Seafood Catering, details as to the set-up and food preparation, etc. The heading of the fax reads, "Prairie Cajun Catering, Inc." At trial, Mr. Fontenot testified that Prairie Cajun Catering belonged to his friend, Jeffrey DeRouen, and that Mr. DeRouen was not a partner in Mr. Fontenot's business.